**Diana G. SCHLEGEL; and Central Pacific Freight Lines, an Oregon Corporation, Plaintiffs–Appellees,**

v.

**William BEBOUT; and Bob Russell, Defendants-Appellants.**

No. 86–3551.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1987.

Decided March 8, 1988.

Michael D. Reynolds, Salem, Or., for defendants-appellants.

Elden M. Rosenthal, Portland, Or., for plaintiffs-appellees.

Before ANDERSON, TANG and NOONAN, Circuit Judges.

### ORDER

The mandate is recalled and the Opinion filed November 3, 1987 and reported at 831 F.2d 881 is withdrawn.

The attached Opinion shall be filed and substituted for the withdrawn Opinion.

Circuit Judge NOONAN continues to adhere to his dissent and the clerk is instructed to refile that dissent simultaneously with this Opinion.

### OPINION

J. BLAINE ANDERSON, Circuit Judge:

William Bebout and Bob Russell (appellants) appeal the district court's denial of their motion to dismiss Schlegel's complaint, pursuant to Fed.R.Civ.P. 12(b). Appellants alleged that they were entitled to absolute immunity from suit for claims brought under 42 U.S.C. § 1983 based on their status as a Public Utilities Commission (PUC) Assistant Commissioner (Bebout) and a PUC Deputy Commissioner (Russell). We affirm.

### FACTS

#### A. BACKGROUND

The basis of Schlegel's claim is that appellants initiated and participated in irregular and discriminatory actions during the time period in which an administrative hearing on intrastate trucking applications was in progress. Appellee Dana Schlegel owns and operates Central Pacific Freight Lines, an intrastate trucking corporation. She alleges that appellants interfered in the evidence-producing process, had repeated ex parte contacts with the hearing officer for the purpose of influencing the outcome of the hearing, and continued the irregular and discriminatory actions after the hearing was over in an attempt to harass appellees.

In October, 1983, miscellaneous applications for regular route intrastate trucking authority within Oregon were consolidated for a hearing. This hearing ran until June, 1984. When such a hearing is convened, the Oregon Administrative Rules (OAR) provide that the hearing shall be conducted by a presiding officer. OAR 860–12–035, OAR 860–14–030, *et seq.* In the normal hearing for route authority, the order of

procedure is that the applicant or petitioner presents evidence, followed by protestants, participants, the Commissioner's staff, and then rebuttal. OAR 860–14–035(1)(c). In consolidated hearings, the presiding officer shall designate the order of procedure. OAR 860–14–035(2). At a hearing for route authorities, and at all other hearings before a presiding officer, all relevant evidence which the presiding officer holds is the "best evidence reasonably obtainable, having due regard to its necessity, availability and trustworthiness" is admissible. The presiding officer is given certain grants to take official notice of evidence. Resolutions, exhibits, depositions and interrogatories are admissible. Written testimony is admissible, as are records from other proceedings and stipulations as to facts. Briefs and oral arguments may be submitted to the presiding officer. In addition, parties have the right to object to evidence. OAR 860–14–045, *et seq.* It is also required that if any ex parte contact occurs between parties to a proceeding and the Commissioner or members of the commissioner's staff, reasonable notice is required to be given to all parties of such conference. OAR 860–12–015.

After the hearing, the presiding officer issues a proposed order. If parties, or the Commissioner's staff, disagree with the proposed order, they may take exceptions. The Commissioner himself may then modify, reject, or adopt the proposed order as his own. OAR 860–14–092.

■ In short, hearings to determine the granting or denial of applications for intraroute authorities envision an independent presiding officer accepting evidence. The PUC Commissioner may act only after this hearing. However, the Commissioner may not act unless his actions are supported by the record as developed at the hearing. Or.Rev.Stat. §§ 756.580, 756.598.

## B. THE COMPLAINT

It is the actions by appellants which occurred during and after this hearing that form the basis for Schlegel's complaint. According to appellees, as alleged in their complaint:

In November, 1983, with the intention of influencing the outcome of the hearing, appellants circulated false financial information regarding Schlegel and her trucking company. This conduct was not the type of conduct usually performed by the PUC and was done for the sole purpose of damaging appellees. (Complaint ¶ 10).

In November, 1983, at appellants' direction, auditors performed, for the second time that year, a compliance audit at appellees' headquarters. This audit was irregular and discriminatory, not in the ordinary course of business for the PUC, was done to harass appellees, and resulted in information leaking to certain participants in the hearing and to the hearing officer that appellees were guilty of twelve violations of state transportation laws. A cease and desist letter was issued by appellants although they knew appellees were not guilty of any such violations. (*Id.* ¶ 11).

In January, 1984, appellant Bebout, in an informal conversation with Schlegel, detailed proposed results of the pending hearing and threatened Schlegel that if she did not cooperate in his proposed resolution of all pending route authority issues, he would make sure she would be denied route authorities critical to her business. She refused and the hearing continued. (*Id.* ¶ 12).

In February, 1984, again at appellants' direction, a third compliance audit was performed. This audit was illegal and discriminatory in that it, too, was designed to influence the outcome of the hearing. After reviewing 14,000 freight bills, one violation was found. (This involved a $23 pickup and delivery). A formal complaint was issued. This was the first time in PUC history that a formal complaint was issued based on a finding of one freight movement violation. This complaint was issued to harass and discriminate against appellees and to influence the outcome of the hearing. (*Id.* ¶ 13).

In February, 1984, appellants threatened to put Schlegel out of business unless she changed her corporate attorney and went along with proposed settlement as outlined

by Bebout in January. She refused. (*Id.* ¶ 14).

The hearing results were announced in June, 1984. The results were substantially similar to the proposed settlement Bebout had presented in January. (*Id.* ¶ 15).

In August, 1984, appellants caused a complaint to be filed against appellees, alleging that the company violated PUC regulations due to a particular interline connection it had entered into with an interstate carrier. Appellants caused a press release to be distributed which claimed that the alleged violation was "probably the most serious violation in the history of Oregon trucking." This statement was not true and was released as part of the continuing harassment and singling out of appellees for the purpose of causing economic injury. Appellant Bebout also threatened legal action against any shipper utilizing Schlegel's trucking company's services. (*Id.* ¶ 16).

As directed by appellants, PUC inspectors appeared and inspected the Portland yards of Central Pacific Freight Lines. The chief inspector told appellants that the company passed with excellent results. With the intention to harass, intimidate, single out, and cause economic harm to appellees, appellants ordered an unannounced, re-inspection at the Portland and Eugene yards. (*Id.* ¶ 17).

On this foundation, Schlegel strives to build a federal civil rights (42 U.S.C. § 1983) claim and pendent state law claims for defamation and interference with economic relationships. Under the 42 U.S.C. § 1983 claim, Schlegel alleges that the defendants' actions violated the equal protection clause of the fourteenth amendment because facially valid laws were applied in an unjust, discriminatory manner against them and other persons similarly situated.

## C. DISTRICT COURT PROCEEDINGS

Appellants, who claim they are entitled to absolute immunity, moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim and for lack of subject matter jurisdiction. Appellants further alleged that since Schlegel was not entitled to relief under 42 U.S.C. § 1983, the pendent state law claims should be dismissed for lack of jurisdiction. On December 26, 1985, the district court denied the motion to dismiss and granted appellants' request for the right to an interlocutory appeal as to the prosecutorial immunity issues since they involved a controlling question of law as to which there is a substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of the litigation.

On July 9, 1986, a two-judge motions panel of this court denied Schlegel's motion to dismiss the appeal for lack of jurisdiction. It found that denial of a motion to dismiss based on absolute immunity is an appealable interlocutory order.

## JURISDICTION

■ While we give deference to motions panel decisions made in the course of the same appeal, this court has an independent duty to decide whether we have jurisdiction. *See United States v. Houser,* 804 F.2d 565, 568 (9th Cir.1986). However, we agree with the motions panel and find that a denial of a motion to dismiss based on a claim of absolute immunity is an appealable interlocutory order. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982).

## STANDARD OF REVIEW

■ A ruling on a motion to dismiss for failure to state a claim is a ruling on a question of law and is reviewed *de novo.* *See Fort Vancouver Plywood Co. v. United States,* 747 F.2d 547, 552 (9th Cir.1984).

## DISCUSSION

In this interlocutory appeal, the issue we must decide is whether appellants' claim of absolute immunity was properly denied. We find that it was.

The language of 42 U.S.C. § 1983 is broad and sweeping: "Every person" who, under color of state law or custom, "subjects, or causes to be subjected, any citizen

of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured...." 42 U.S.C. § 1983 (1982). "By its terms, § 1983 'creates a species of tort liability that on its face admits of no immunities.'" *Owen v. City of Independence,* 445 U.S. 622, 635, 100 S.Ct. 1398, 1407, 63 L.Ed.2d 673 (1980) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976)).

Despite the broad statutory language of § 1983 and the absence in the legislative history of any attempt to narrow it, it is well established that certain classes of public officials enjoy at least some type of immunity from § 1983 suits. *Sellars v. Procunier,* 641 F.2d 1295, 1298 (9th Cir.), cert denied, 454 U.S. 1102, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981). Immunities are extended to government officials only when "overriding considerations of public policy nonetheless deman[d] that the official be given a measure of protection from personal liability" to ensure his ability to function effectively. *Owen,* 445 U.S. at 653, 100 S.Ct. at 1416.

■ If found, immunity may be either absolute or qualified. The common-law absolute immunity of judges for "acts committed within their judicial jurisdiction was preserved under § 1983." *Pierson v. Ray,* 386 U.S. 547, 554–55, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967). This immunity is upheld even when the judge is accused of acting maliciously and corruptly because imposing a burden on judges would contribute not to principled and fearless decision-making, but to intimidation. *Id.* at 554, 87 S.Ct. at 1218. The Supreme Court has extended absolute immunity to certain others who perform functions closely related to the judicial process. The federal hearing examiner and administrative law judge have been afforded absolute immunity. "There can be little doubt that the role of a modern federal hearing examiner or administrative law judge ... is 'functionally comparable' to that of a judge." *Butz v. Economou,* 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978). Full immunity

also has been given to federal and state prosecutors. *Yaselli v. Goff,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed.2d 395 (1927); *Imbler,* 424 U.S. at 424–26, 96 S.Ct. at 992–93. The same is true for witnesses, including police officers, who testify in judicial proceedings. Witnesses are "integral parts of the judicial process" and, accordingly, are shielded by absolute immunity. *Briscoe v. LaHue,* 460 U.S. 325, 335, 103 S.Ct. 1108, 1115, 75 L.Ed.2d 96 (1983). The Supreme Court has likewise noted the adoption in this country of the principle of immunity for grand jurors. *See Imbler,* 424 U.S. at 423, n. 20, 96 S.Ct. at 991 n. 20. *See also Butz,* 438 U.S. at 509–10, 98 S.Ct. at 2912–13. Thus, absolute immunity will be granted to those who fall within one of the conscribed areas of judicial or prosecutorial immunity.

■ We now turn to the issue we must address today which is whether appellants should have been granted absolute prosecutorial immunity. It is true, as appellants argue, that agency officials who perform functions analogous to a prosecutor enjoy prosecutorial immunity. *Butz,* 438 U.S. at 515, 98 S.Ct. at 2915. Prosecutorial immunity also applies to state administrative officials who perform functions analogous to those of a prosecutor. *Sellars,* 641 F.2d at 1303. Thus, a PUC official may qualify for absolute immunity if he or she performs functions analogous to those of a prosecutor.

■ To determine whether absolute prosecutorial immunity exists, we must ask if the prosecutor acts within the scope of his or her authority and in a quasi-judicial capacity. *Ybarra v. Reno Thunderbird Mobile Home Village,* 723 F.2d at 678. The focus of the analysis, particularly in considering the quasi-judicial capacity aspect, is on the nature or function of the prosecutor's authority. *Id.* Absolute immunity is warranted if the prosecutor acts as advocate in initiating a prosecution and in presenting the state's case. *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 994–95.

The Supreme Court considered the nature of prosecutorial immunity in *Imbler,* where a § 1983 complaint alleged that the

prosecutor knowingly introduced perjured testimony. The Supreme Court held that the prosecutor was immune from a § 1983 suit for damages for his quasi-judicial activity. *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 994–95. The Court concluded that "qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.,* 424 U.S. at 427–28, 96 S.Ct. at 993–94. The Court limited its holding by stating:

> "We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."

*Id.,* 424 U.S. at 430–31, 96 S.Ct. at 994–95.

The question left open in *Imbler* of whether absolute immunity attaches to acts that are functionally administrative or investigative has been addressed by this Court. We have held on several occasions that investigative functions carried out in preparation of a prosecutor's case enjoy absolute immunity. In *Ybarra v. Reno Thunderbird Mobile Home Village,* 723 F.2d 675, 678 (9th Cir.1984), we granted absolute immunity to the prosecutor's act of releasing a mobile home as evidence. We ruled that the conduct was quasi-judicial even though it could be characterized as an investigative act. In *Freeman on Behalf of the Sanctuary v. Hittle,* 708 F.2d 442, 443 (9th Cir.1983), we held that absolute immunity is accorded to investigative functions carried out pursuant to the preparation of a prosecutor's case. We have also granted absolute immunity to a deputy attorney for conferring with potential witnesses to gather evidence in deciding whether to initiate proceedings to revoke a medical license. This conduct was determined to be part of a prosecutor's preparation of his case and thus entitled to

absolute immunity. *Demery v. Kupperman,* 735 F.2d 1139, 1144 (9th Cir.1984).

■ Our inquiry must center on the nature of the official conduct challenged, and not the status or title of the officer. As a result, we must examine the particular prosecutorial conduct of which Schlegel complains. If we determine that the conduct is within the scope of appellants' authority and is quasi-judicial in nature, our inquiry ceases since the conduct would fall within the sphere of absolute immunity.

■ To determine whether conduct of a state official is within his or her authority, the proper test is not whether the act performed was manifestly or palpably beyond his or her authority, but rather whether it is more or less connected with the general matters *committed* to his or her control or supervision. *Ybarra,* 723 F.2d at 678. The Oregon Public Utilities Commissioner and his assistants to whom he delegates authority to act on his behalf have broad regulatory, supervisory and investigatory powers over motor carriers in Oregon. Oregon law provides that "[t]he commissioner is vested with power and jurisdiction to supervise and regulate every ... motor carrier in this state...." O.R.S. 756.040(2). The commissioner also has the power to inquire into the management of the business of motor carriers, O.R.S. 756.-070, and to enter upon the premises of any motor carrier "for the purpose of making any inspection, examination or test reasonably required in the administration of O.R.S. chapter 756...." An internal investigation, complaint, and hearing procedure has also been provided for the commissioner in O.R.S. 756.500 to 756.610. Given these broad regulatory powers, we find that appellants were acting within the scope of their authority.

Absolute immunity also depends on the function the officials were performing when taking the actions that provoked the lawsuit. We must look to the nature of the activity and determine whether it is "intimately associated with the judicial phase of the criminal process." *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995. For instance, when a prosecutor decides to litigate, interviews

witnesses, and gathers evidence, he or she is engaging in conduct that relates to the preparation of his or her case. This activity enjoys absolute immunity. Investigative or administrative functions carried out pursuant to the preparation of a prosecutor's case are also accorded absolute immunity.

The particular activities of which Schlegel complains include interference with the evidence producing process, ex parte contacts, performing audits and inspections, issuing cease and desist letters and complaints based on those audits and inspections, making press statements, and advising shippers that if they engage the services of Schlegel, they may face legal action. These actions taken by the officials were not done in order to prepare for an adversarial proceeding, but rather were done to ensure compliance with their procedures. The PUC officials were authorized by law to inspect and regulate. Their actions are not quasi-judicial in nature because they are regulatory, not adversarial.

We find that the consolidated hearing for route authorities was not an adversarial or disciplinary proceeding, but rather was regulatory in nature. Although appellants may function at times in a "prosecutorial-like" manner, it appears that under the circumstances of this case, appellants functioned more as regulators of a utility, investigating companies and ensuring compliance. We find that this is not an "exceptional situation where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Butz*, 438 U.S. at 507, 98 S.Ct. at 2911. We, therefore, find that even though they were acting within the scope of their authority, these PUC officers were not acting in a quasi-judicial capacity, and are not entitled to the absolute immunity afforded to judges, persons performing judge-like roles within federal agencies, or prosecutors.

Since this interlocutory appeal under 28 U.S.C. § 1292(b) was granted as to the prosecutorial issues raised in defendants' (appellants') motion to dismiss, we believe that to answer this controlling question of law, we must also address the issue of qualified immunity.

"For executive officials in general, our cases make plain that qualified immunity represents the norm." *Id.* *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (state governor and his aides); *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982) (presidential aides); *Butz, supra* (cabinet member, acknowledging, however, that there are "those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business," 438 U.S. at 507, 98 S.Ct. at 2911); *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (state prison officials); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (school board members); *Pierson, supra* (police officers).

■ Generally, government officials performing discretionary functions are provided with qualified immunity, shielding them from civil damages liability so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See, e.g., Anderson v. Creighton*, 483 U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Whether an official may be held personally liable for an allegedly unlawful official action mainly turns on the "objective legal reasonableness" of the action assessed in light of the legal rules that were "clearly established" at the time it was taken. *Id.*, 483 U.S. at ——, 107 S.Ct. at 3038, 97 L.Ed.2d at 530 (quoting *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739).

■ The Supreme Court recently examined the level of generality at which the relevant "legal rule" is to be identified. The Court pointed out that the right to due process of law is quite clearly established by the Due Process Clause, and thus it could follow that any action that violates that clause violates a clearly established right regardless of how unclear it may be that the particular action is a violation. In rejecting this approach, the Court stated that it would be possible to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by an allegation of a violation of extremely abstract

rights. "Such an approach, in sum, would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties,' by making it impossible for officials reasonably [to] anticipate when their conduct may give rise to liability for damages." *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed. 2d 139 (1984). It then follows that the right the official is alleged to have violated must be clearly established in a more particularized and relevant sense. This is established by requiring that the contours of the right be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This does not mean that the action in question has been previously held unlawful, but that in light of preexisting law, the unlawfulness must be apparent. *Id.*, 483 U.S. at ——, 107 S.Ct. at 3039, 97 L.Ed.2d at 531.

Based upon these principles, appellants are entitled to immunity if they can prove that a reasonable PUC official could have believed that the action taken was lawful, in light of clearly established law. The existence of a reasonable belief that their conduct was lawful, viewed in the light of clearly established law, is a question for the trier of fact. *See Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1467 (9th Cir.1984). We cannot, therefore, decide this issue.

The district court judgment denying appellants' motion to dismiss on the grounds of absolute immunity is AFFIRMED, and the case is REMANDED for further proceedings consistent with this opinion.

NOONAN, Circuit Judge, dissenting:

The line between absolute and qualified immunity "often is not an easy one to perceive and structure." *Cleavinger v. Saxner*, 474 U.S. 193, 206, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985). In determining where the line must fall, federal judges, being human, are wonderfully perceptive in perceiving that they could not function without absolute immunity, less clearsighted when they look at some other parts of government. The court here has, I believe, misperceived this difficult line. The question, simply put, is, "Is a state Public Utilities Commission more like a school board than a prosecutor?" The court answers, "School board" and applies the qualified immunity of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). "Prosecutor" seems to me the better answer, bearing in mind that public utilities commissions like the Oregon one are charged with prosecutorial duties which in an earlier age, with fewer administrative agencies, would have had to have been discharged by the attorney general. The several audits complained of were in discharge of prosecutorial duty, as was, obviously, the cease and desist letter. The attempts to induce settlement were prosecutorial in nature. Nothing else is relied on by the court except an alleged libel: surely one cannot turn a libel into a civil rights action by saying it deprived one of equal protection!

Now it is true, of course, that the plaintiffs allege that the audits were discriminatory, the attempts to induce settlement were harassment, and the cease and desist letter was baseless; and it is not within the scope of the PUC's duty to discriminate or harass or issue baseless complaints. But neither is it within a prosecutor's duty to offer perjured testimony or suppress evidence, and a prosecutor is immune when charged with such misconduct. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The prosecutor is immune because the merits of his actions cannot be examined without shaking public confidence in his office and his own confidence in his work. *Id.* at 424–25, 96 S.Ct. at 992–93. So here, to subject officers of the PUC to civil rights suits for carrying out their prosecutorial duties is substantially to impair public confidence and their own.

A decent regard for our federal system points to the same conclusion. Public utility commissions are important adjuncts of the state prosecutorial system. If any disgruntled litigant before such a body is free to make a federal civil rights case out of her disappointment, state autonomy is curtailed sharply. In the case at bench the

plaintiffs—losers in an application for trucking routes—have put together allegations of libel (a state tort), added allegations of prosecutorial misconduct, and wrapped around these claims a conclusory assertion that they have been denied equal protection of the law. The damages that the plaintiffs say have flowed from the miscellaneous acts charged are $2 million. Although no clear connection appears between this substantial sum and the three audits, the cease and desist letter, and the state tort, I assume that counsel made reasonable inquiry before stating that such damages were suffered. Fed.R.Civ.P. 11. To have to defend against such damages is a deterrent to public prosecutorial service. Neither the federal system nor the civil rights laws require state officers to face such claims in a federal court.