**CHALKBOARD, INC.; Karen M. Hoyt, Plaintiffs–Appellees,**

v.

**Susan BRANDT; Boyd Dover; Lucinda Blair; Andy Harclerode; Sherry Meredith; Lloyd Novick; Douglas X. Patino; Darwin Cox, Defendants–Appellants.**

No. 88–1523.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 1988.

Decided July 13, 1989.

Anthony B. Ching, Atty. General's Office, Phoenix, Ariz., for defendants-appellants.

Elliott Glicksman, Tucson, Ariz., for plaintiffs-appellees.

Before PREGERSON, CANBY, and BEEZER, Circuit Judges.

CANBY, Circuit Judge:

The plaintiffs, Chalkboard, Inc., a day care center, and its owner-operator Karen Hoyt[1] brought this civil rights action in District Court for money damages against officials of the Arizona Department of

---

1. Hereafter we refer to both plaintiffs as "Chalk-     board".

Health Services ("DHS"), and the Arizona Department of Economic Security ("DES"), agencies responsible for child day care programs. The claim is based on defendants' actions in summarily suspending Chalkboard's license to operate a day care center. The defendants moved for summary judgment on grounds of absolute and qualified immunity. The District Court denied the motion and the defendants appeal. We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), *Kraus v. County of Pierce*, 793 F.2d 1105, 1107–8 (9th Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987).

We review de novo the denial of defendants' motion for summary judgment. *Kraus v. County of Pierce*, 793 F.2d at 1106–07.

FACTUAL BACKGROUND

On October 10, 1985, the Tucson Police Department received a complaint from a local citizen that her young daughter had been sexually abused while at Chalkboard by a teacher on its staff. The Police notified the Office of Child Protective Services, a unit of DES, and defendant Susan Brandt of DES began an investigation. On the same day, DHS, the agency responsible for licensing and monitoring day care centers, was notified and also initiated an investigation.

During the next several days Brandt learned from interviews with students and one former employee of Chalkboard of at least one other complaint of sexual abuse concerning the same teacher. She also learned of several complaints of physical abuse, including the disciplining of children by tying their hands behind their backs with sheets, placing the children on a high shelf, or locking them in a shed or outside of the center. The former employee testified at a deposition that she had informed the investigators that the incidents of physical abuse had stopped several months prior to the investigation. These accusations were also encountered by two investigators from DHS, defendants Sherry Meredith and Lucinda Blair. The DHS investigators learned from Hoyt that the teacher accused of the sexual abuse incidents had been suspended pending the outcome of the investigation. While at Chalkboard, the DHS investigators also noted that the day care center was over capacity, a problem of which Chalkboard had already been warned in 1983.

On October 16, 1985, defendant Boyd Dover, Deputy Director of DHS, issued an order summarily suspending Chalkboard's license on the grounds of the alleged sexual molestation, the alleged physical abuse, and overcrowding. On the following day, an administrator of DES stood on the sidewalk in front of Chalkboard to inform parents of the closure and advise them of alternative day care centers. The press was also present at this time. Prior to Chalkboard's closure, approximately 85% of its enrollment was under contract with DES. The license suspension automatically resulted in cancellation of these contracts as well as Chalkboard's Department of Agriculture funding for food programs.

On the day of the suspension, Hoyt was notified of an administrative hearing on the license suspension to be scheduled in the near future. This hearing was subsequently scheduled for October 24, 1985, eight days after the suspension. Immediately after the suspension, however, Chalkboard had filed an action in Arizona Superior Court seeking an injunction. On October 18, at a hearing in state court, Chalkboard sought leave to withdraw the complaint, which was granted. On October 23, 1985, this action was filed. On October 24, Chalkboard appeared at the administrative hearing and stipulated to a postponement. Ultimately, Chalkboard elected not to attend the hearing.

ABSOLUTE IMMUNITY

Defendants first argue that they are absolutely immune. In general, executive officials are protected only by qualified immunity. *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1977). In certain instances, however, executive officials may be entitled to absolute immunity, but such instances are limited "to those exceptional situations where it is

demonstrated that absolute immunity is essential for the conduct of public business." *Id.* The burden is on the official seeking immunity to show that the immunity is "justified by overriding considerations of public policy." *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988).

The Supreme Court has made clear that absolute immunity depends upon the particular function performed by the official. *Butz,* 438 U.S. at 508, 98 S.Ct. at 2911. The question is not one of status, but of the "nature of the responsibilities of the individual official." *Cleavinger v. Saxner,* 474 U.S. 193, 201, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985). The prime categories of executive officials that are entitled to absolute immunity are those whose functions parallel the functions of judges and prosecutors. *Butz,* 438 U.S. at 511–15, 98 S.Ct. at 2913–15; *see Schlegel v. Bebout,* 841 F.2d 937, 942 (9th Cir.1988). It is these categories into which defendants seek to fit themselves.

This case arises, however, out of the DHS officials' summary closure of Chalkboard. To the extent that such action may be judicial or prosecutorial, it is essential that this function be assigned by state law to the DHS. A judge who wrongfully sentences an accused to prison is absolutely immune; a policeman who takes it upon himself to perform that function clearly is not. We must therefore examine whether the DHS officials were placed, under state law, in the functions equivalent to those of judge or prosecutor with regard to Chalkboard's summary closure.

The DHS officials contend that they were authorized summarily to close Chalkboard under Ariz.Rev.Stat.Ann. § 41–1064(C)(1988)[2], which states;

> No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the action, the agency provides the licensee with notice and an opportunity for a hearing in accordance with this chapter. If the agency finds that public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined.

This provision is part of the Arizona Administrative Procedure Act, which forms a general set of rules applicable to administrative agencies in the absence of a more specific statutory structure. *See Didlo v. Talley,* 21 Ariz.App. 446, 448, 520 P.2d 540, 542 (1974). Chalkboard contends, and the district court held, that DHS was governed by just such a specific statutory structure that included a provision for obtaining expedited closure of day care centers. Ariz. Rev.Stat.Ann. § 36–886.01 (1986) provides:

> When the department has reason to believe that a day care center is operating under conditions that present possibilities of serious harm to children, the department shall notify the county attorney or the attorney general, who shall immediately seek a restraining order and injunction against the day care center.[3]

The district court concluded that the two provisions were in conflict and that Arizona

---

2. This section was formerly codified at Ariz.Rev. Stat.Ann. § 41–1012(c).

3. This procedure is considerably more expeditious than the normal license suspension procedure under the same statutory scheme, Ariz.Rev. Stat.Ann. § 36–889. The latter statute provides:

> The department may revoke or suspend the license of any person for a violation of applicable law or regulations. The department shall afford the affected licensee the right of a hearing by serving upon the licensee at least thirty days' notice, by registered mail with return receipt requested, to show cause before the director, upon a date to be fixed in the notice, why the license should not be suspended or revoked in accordance with the regulations of the department and the provisions of law. The notice shall set forth the act or acts constituting the violation and shall refer to the provisions of the applicable law or regulations alleged to be violated. If the licensee does not respond to the written notice within the period provided in the notice, the department shall revoke or suspend the license. If the licensee, within the period provided by the notice, rectifies the acts constituting the violation, the department may withdraw the notice of suspension or revocation.

law dictates that statutory conflicts be settled in favor of the more specific statute. *See Arden–Mayfair, Inc. v. Department of Liquor Licenses and Control,* 123 Ariz. 340, 342, 599 P.2d 793, 795 (1979); *Arizona State Tax Commission v. Phelps Dodge Corporation,* 116 Ariz. 175, 177, 568 P.2d 1073, 1075 (1977), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978). The DHS officials maintain that there was no conflict between Ariz.Rev.Stat.Ann. § 41–1064(C) and Ariz.Rev.Stat.Ann. § 36–886.01, and that DHS was free to use either provision.

While the Arizona Supreme Court has never defined the relationship between the two statutes, its decisions in *Arden–Mayfair,* and *Phelps Dodge,* supra, render the officials' view implausible. We cannot accept the contention that a general purpose summary-closure provision enacted years earlier remains at the disposal of the DHS officials when the state has adopted a more recent and specific statutory scheme which provides for both routine and expedited methods of suspending the license of a day care center and which does not permit summary action by agency officials.

█ Thus, Arizona has provided, under section 36–886.01, for prosecutors and judges to effect a summary closure of day care centers. It is entirely possible that DHS officials who directly serve that process in one way or another will be absolutely immune. *See Coverdell v. Department of Social and Health Services,* 834 F.2d 758 (9th Cir.1987) (social worker seeking and obtaining a child dependency order is absolutely immune). But in by-passing the statutorily mandated procedure entirely,[4] and arrogating to themselves a function that state law denies them, defendants have not served in a judicial or prosecutori-al capacity that conferred absolute immunity.

Our precedent supports our conclusion that state law must authorize the prosecutorial or judicial function to which absolute immunity attaches. In *Ybarra v. Reno Thunderbird Mobile Home Village,* 723 F.2d 675 (9th Cir.1984), we held a prosecutor to be absolutely immune in releasing certain evidence after trial, pointing out that he acted "well within his authority as a deputy district attorney, empowered to preserve or to release" the evidence. *Id.* at 678. Similarly, in *Coverdell,* we emphasized that the absolutely immune social worker's action in seeking a court order was "not only within the scope of her authority under Washington law, [but] may well have been required." *Coverdell,* 834 F.2d at 764. Here, in summarily closing Chalkboard without a hearing, DHS was not acting in a role assigned to it by state law.[5] The district court was correct in denying absolute immunity.

QUALIFIED IMMUNITY

The fact that state law did not put the defendants in the position of prosecutors or judges does not, however, necessarily deprive them of all immunity. *See Meyers,* 812 F.2d at 1157–58. Executive officials are protected against actions for damages by the doctrine of qualified immunity unless, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1981).

To determine whether the defendants' claim of qualified immunity should have been sustained, we determine whether the

---

**4.** *Cf. Meyers v. Contra Costa County Dep't of Social Services,* 812 F.2d 1154, 1157 (9th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987) (absolute immunity denied to social worker who ordered father away from his home; "[r]ather than contributing to an informed judgment by an impartial decisionmaker as an advocate, [social worker] acted unilaterally prior to the operation of the judicial process").

**5.** We thus distinguish cases such as *Horwitz v. Bd. of Medical Examiners,* 822 F.2d 1508 (10th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987), and *Austin Municipal Securities v. Nat'l Ass'n of Securities Dealers,* 757 F.2d 676 (5th Cir.1985), where members of boards *exercising statutorily-delegated authority* to suspend professional licenses summarily were accorded absolute immunity.

plaintiff alleges a "plain violation of law which has a settled substantive content." *Kraus v. County of Pierce,* 793 F.2d at 1108. Here there is no question whether the alleged deprivation took place. The only question is whether the deprivation constituted a violation of settled rights.

■ We conclude that Hoyt, as operator of Chalkboard, had a clearly established due process right to a hearing before her license was suspended, at least in the absence of an emergency—a point we discuss later. We note that defendants do not dispute that Chalkboard's license constitutes an entitlement amounting to a property interest; they only contend that it may be suspended without a pre-deprivation hearing. But the Supreme Court has identified a person's constitutionally protected interest in a continued livelihood as sufficiently strong to require a due process hearing prior to any state deprivation.

> We have described the "root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

*Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (internal citations omitted).

A license may become comparable to an interest in employment where it is clearly linked to a person's ability to earn a living. In *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), the Supreme Court noted with respect to a driver's license that "[o]nce licenses are issued, as in

petitioner's case, their continued possession may become essential in the pursuit of a livelihood". *Id.* at 539, 91 S.Ct. at 1589. The Court went on to hold that "due process requires that when a State seeks to terminate an interest such as that here involved, it must afford " 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." *Id.* at 542, 91 S.Ct. at 1591.

While it is not necessary to assume in all cases that a license to operate a day care center is essential to the livelihood of the license holder, the record here supports the conclusion that plaintiff Hoyt was deprived of her ability to carry on in the day care business as a result of the summary suspension of her license.

The defendants point to a number of cases in which the Supreme Court has upheld the summary suspension of licenses without a pre-deprivation hearing[6]. These cases can be distinguished because they differ significantly from the situation here in terms of the "risk of an erroneous deprivation ... and the probable value, if any, of additional or substitute procedural safeguards." *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

In the license cases cited by the defendants the standards for invoking official action were precisely set out, and the evidence required to meet these standards was readily determinable without the participation of the license holder. In short, they called for the mechanical application of rules in which a hearing is of limited usefulness. In contrast, pre-deprivation hearings are most valuable where the decision is open textured and subject to some discretion. In *Loudermill,* for example,

---

**6.** In *Dixon v. Love,* 431 U.S. 105, 113, 97 S.Ct. 1723, 1727, 52 L.Ed.2d 172 (1977), the Court upheld an Illinois statute authorizing summary suspension of a driver's license on determination by a state agent that the driver had accumulated a specific number of points meeting a predetermined standard for deprivation. In *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979), the Court upheld a Massa-

chusetts law that provided for summary suspension of a driver's license where the driver has refused to take a breath-analysis test. In *Barry v. Barchi,* 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979), the Court upheld a New York law providing for summary suspension of a horse trainer's license predicated on the chemical testing of horses for which the trainer was responsible.

the employee was discharged for having lied about a past criminal conviction. Determining what is a lie as opposed to an honest mistake is a judgment not easily reduced to a formulaic measurement of facts.

> Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decision maker is likely to be before the termination takes effect.

*Loudermill,* 470 U.S., at 543, 105 S.Ct. at 1494. The decision to suspend the license to operate a day care center is one calling for substantial exercise of judgment.

■ In determining whether reasonable state officials would have known that their actions violated the constitutional or statutory rights of the plaintiffs, we assume that such officials are aware of available decisional law. *Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). The Supreme Court's decision in *Loudermill* preceded the officials decision to summarily suspend Chalkboard's license by more than six months[7]. That decision established clear due process minima for state actions depriving persons of their livelihood. More than fourteen years earlier, the Supreme Court in *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), had established that the suspension of a license required a pre-deprivation hearing where the license was essential to a person's livelihood. Based on the judicial precedent existing at the time, the defendant officials should have known that they were violating the plaintiffs rights. A grant of summary judgment on the grounds of immuni-ty was not warranted on the undisputed facts and was correctly denied by the district court.

■ Qualified immunity remains as an affirmative defense to be considered by the ultimate finder of fact. Defendants contend that emergency conditions existed that constitutionally justified summary suspension of Chalkboard's license without a prior hearing[8], or at least that reasonable persons might so have concluded. The facts concerning the presence or absence of an emergency are highly controverted, however. It may be that resolution of that or other disputed matters at trial may validate the defendants' claim of qualified immunity; we express no opinion on that question, of course. All that we hold here is that, on the undisputed facts presented on motion for summary judgment, the defendants failed to show that they were entitled to immunity as a matter of law.

The order of the district court denying defendants' motion for summary judgment is affirmed, and the matter is remanded for further proceedings.

AFFIRMED AND REMANDED.

7. In *Horwitz v. Bd. of Medical Examiners of the State of Colorado,* 822 F.2d at 1517, where the court found qualified immunity for the defendants, the court noted that *Loudermill* was not decided at the time of Dr. Horwitz's suspension from his job without a pre-deprivation hearing.

8. In a somewhat analogous situation concerning termination of a hospital resident, this court noted that "where patient welfare is in immediate jeopardy or where the effective functioning of the hospital is severely threatened, a hospital might well be justified in immediate termination with the informal hearing procedures held shortly thereafter." *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 369 n. 20 (1976).