**Carrie MELEAR and Willie Stewart, Plaintiffs–Appellees,**

v.

**Wayne SPEARS, etc., et al., Defendants,**

**Ron Averitt, etc., Defendant–Appellant.**

No. 87–1724.

United States Court of Appeals, Fifth Circuit.

Jan. 12, 1989.

Betty Wheeler, San Diego, Cal., for Melear et al.

Donald M. Hunt, Carr, Evans, Fouts & Hunt, Lubbock, Tex., for Ron Avirett.

Before GOLDBERG, HIGGINBOTHAM and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

Ron Avirett, the appellant in this case, asks us to review the soundness of a judgment predicated on a jury verdict. The jury concluded that Avirett is liable in his personal capacity under 42 U.S.C. § 1983 for his participation in a police search of an apartment building in Bovina, Texas. The jury also awarded both actual and punitive damages to the appellees, Carrie Melear and Willie Stewart. Avirett contends that the verdict is not supported by the evidence. Acutely aware of the sanctity of the jury's role in our system of adjudication, we acknowledge our duty of review, but we dare only step lightly as we perform our obligation.

As we undertake our task, we are reminded of and instructed by a rather more grand and celebrated dispute. Montesquieu once predicted the demise of the English system of liberty by comparing England and once-powerful ancient cultures. In the Commentaries, Blackstone chose an apparently mundane basis for rebuttal, contending that Montesquieu "should have recollected that Rome, Sparta

and Carthage, were strangers to trial by jury."[1] We likewise revere the jury's function, just as we revere the right to the jury trial that Avirett exercised. Heeding the lessons of history, and finding clearly sufficient evidence in the record to support the verdict, we affirm the judgment of the district court.

## I. PROCEDURAL BACKGROUND

The appellees, Melear and Stewart, sued Avirett and five other defendants under 42 U.S.C. § 1983 for the warrantless search of their apartments on May 10, 1984. Stewart was a tenant in the low-income, five-unit building, which the 69 year-old Melear owned and also lived in. Avirett was a deputy sheriff in Parmer County, Texas. The other defendants were Parmer County; the City of Bovina; Wayne Spears, who was the Bovina city manager and justice of the peace; Rodney Bachman, the Bovina police chief; and Mel Clark, a Bovina police officer.[2]

The jury found that the defendants, Spears, Clark, Bachman and Avirett, were jointly and severally liable to Melear and Stewart for actual damages, and were individually liable for punitive damages. On March 12, 1986, the district court entered judgment in accordance with the jury verdict. Spears, Clark and Bachman have not appealed. Avirett filed timely motions to alter or amend the judgment, for a new trial, and for judgment notwithstanding the verdict under F.R.Civ.P. 50 and 59. The district court denied the motions on August 21, 1987. Avirett proceeded with this appeal. He argues that (1) he is entitled to qualified immunity in his personal capacity according to the standards of *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), because a reasonable officer, in light of existing law, could have concluded under the circumstances of this case that probable cause and exigent circumstances justified the apartment searches; (2) his status as a backup officer

in the search of Willie Stewart's apartment is an alternative ground entitling Avirett to qualified immunity; (3) his participation in the search of Carrie Melear's apartment did not constitute a Fourth Amendment violation necessary to predicate liability under Section 1983; and (4) punitive damages are not supported by the evidence.

## II. FACTS

An extensive array of facts lies in the record. The evidence affords a solid foundation for the jury's conclusions regarding this disturbing tale of police misconduct.

The evidence from which the jury drew its conclusions demonstrates that early in the evening on May 10, 1984, two individuals named Carmelo and Jinio, armed with a handgun and machete, drove to the house of Terisa Diaz. Terisa's cousin, Elodia, lived across the street. Elodia was married to a man named Steve Madrigal, but they were often separated. Elodia and Carmelo apparently had been seeing each other during the most recent period of separation. While in front of Terisa's house, Carmelo asked Terisa if she knew whether Steve was at Elodia's house. Terisa replied that she thought so. Carmelo responded that he intended to kill Steve and then drove to Elodia's nearby house with Jinio. Steve was not at home.

Sometime shortly thereafter, Elodia called the police to report Carmelo's death threat. Terisa, meanwhile, went to the home of her boyfriend, Eusebio Salazar, to tell him that Carmelo and Jinio might be coming over to Salazar's house and that the police might be searching for the two men. Salazar's roommate was friendly with both of the men. In fact, both Carmelo and Jinio appeared at Salazar's house. After they arrived, Salazar drove away, Terisa left on foot, and Carmelo left on foot, having given Terisa his car keys.

During this sequence of events, the wife of Rodney Bachman, the police chief of

1. 3 W. Blackstone, Commentaries *379.

2. Several other plaintiffs sued the defendants. Their claims were adjudicated both before and during the trial and are not involved in this appeal. The trial court directed a verdict for Parmer County and the City of Bovina because there was no evidence in the record that could form a basis for municipal liability.

Bovina, received an anonymous telephone call at their home reporting a possible fight near Elodia's house. At the time of the telephone call, Rodney Bachman was at the home of Spears, the Bovina city manager and justice of the peace, along with the appellant, Avirett, a Parmer County deputy sheriff. The three men were attaching a tow bar to the back of a vehicle owned by Spears, a project they had started in the late afternoon. All three were off-duty and were drinking beer as they worked. The evidence showed that Avirett had consumed three cans of beer.

At approximately 9:00 P.M., Mel Clark, a Bovina police officer, arrived at the Spears home as the three men were completing the project. Clark had finished a can of beer with his meal earlier in the evening. He was at the Spears home to pick up the city police car, which Bachman had been driving, in case Clark received any emergency calls that night.

When Mrs. Bachman called the Spears home with the information she received from the anonymous telephone caller, Clark took the message. He then drove in the police car to the area of the reported fight. After he left, Bachman, Spears and Avirett decided to drive to the area to afford backup to Clark in the event he needed help. Bachman and Spears proceeded in one private car, and Avirett drove his personal car.

After Clark arrived at the scene, Elodia informed him of the death threat. Bachman, Spears and Avirett arrived shortly thereafter. Clark then reported that the problem was not a fight, but a death threat.

None of the defendants obtained detailed information concerning Carmelo's description. Clark received the only description. He was told that the suspect was wearing a red shirt, blue jeans, had a "dark complexion," and was probably a "Black man or dark-colored Mexican." Clark apparently relayed this vague description to his three colleagues, but confusion among the officers remained: at the trial, Avirett testified that Clark told him there were *two* suspects, armed with a gun and a knife, who had made a death threat.

Armed with their scant but newfound information, the four defendants set out in search of the suspect in their respective vehicles. Bachman, joined by Clark, soon stopped Craig Pearson, a young Black man who was out for a walk in a red shirt and blue jeans. At this point, Terisa Diaz and Jinio's ex-girlfriend walked up and described Carmelo and Jinio to Bachman and Clark. Terisa gave them Carmelo's keys, and told them that he was in the area on foot.

Terisa then went to her cousin Elodia's house. Standing in Elodia's yard, they flagged down Spears and Avirett as they drove by. The women stated that Carmelo had run across the alley "to the next alley," "going *towards* the pool hall," "*toward* the Melear Apartments." During this time, Clark stopped Eusebio Salazar, who was driving by at the time in a bright red jacket and blue jeans. Clark apprehended Salazar, and placed him in the police car, in which Craig Pearson was already sitting.

As the events progressed toward the initiation of the searches, the pool of evidence becomes slightly murkier, though far from opaque. Officer Clark testified that after he placed Salazar in his vehicle, he received information from a Mrs. Porras, a nearby resident whom he knew and believed to be reliable and credible, that the suspect had run *into* the Melear Apartments. Mrs. Porras did not testify at the trial, and the evidence shows that the day after the incident she denied having made the statement attributed to her by Clark. The evidence also shows that anyone standing in Mrs. Porras' front yard, or near her house, could have seen only part of the Melear apartment building, and could not have seen either entrance to the building. No testimony suggests that Mrs. Porras ever left her yard during this time period. Finally, Avirett testified at the trial that Clark stated that the suspect was going *toward* the Melear Apartments.

The Melear apartment house is a two-story building. The first floor was a vacant

storage area in May, 1984. There are five apartment units on the second floor. They all open onto a central hallway. Stairwells at both ends of the hallway lead to entrances on the first floor at opposite ends of the building.

After leaving Elodia's front yard, the four defendants, including the appellant Avirett, proceeded to the Melear Apartments in search of the red-shirted, blue-jeaned suspect with a dark complexion. Because the building has two entrances, Clark, backed up by Avirett, proceeded up one stairwell. Bachman, backed up by Spears, climbed the other stairs. The two groups made visual contact with each other at the top of the stairs.

The tempo of the search already stepped up, it began to move at breakneck speed. Clark, backed up by an armed Avirett, knocked on the door of the appellee Willie Stewart, loudly announcing "police." The officers repeated this process two more times. Bachman, who was down the hall, then instructed Clark to kick the door in. Clark obeyed. Avirett, armed with his gun, remained at the door of the apartment to back up Clark. Stewart, asleep and hearing-impaired, awakened as Clark entered the apartment. He became frightened and thought he was going to be killed. Clark testified that he explained why he broke into the apartment, but Stewart did not recall whether Clark explained his presence. A search of the apartment uncovered no red-shirted, blue-jeaned suspect with a dark complexion.

Meanwhile, at the other end of the hall, Bachman kicked in the door of another apartment after knocking and announcing "police." No one was in the apartment at the time. The officers repeated this process at the doors of the third and fourth apartments in the building. Both apartments were occupied, but Bachman nevertheless kicked in one of the doors. The officers did not find the suspect in these apartments either.

During the searches of the four apartments, Carrie Melear, who owned and managed the building, emerged into the hall after hearing the noise of splintering doors and breaking glass. Although Avirett told her to remain in her apartment until the other searches were completed, she demanded to know what was going on.

The officers, after completing the searches of the other four apartments in the building, proceeded to the Melear unit. Her apartment had two doors that opened into the hall. As Bachman attempted to kick in one of her doors, Melear stated that she would go back into the apartment to unlock the door from the inside. Backman assented, but insisted on sending Spears and Avirett with her into the apartment. Avirett had his gun pointed at Melear as they followed her. The officers searched the apartment, the last of the building's five units, but failed to uncover the red-shirted, blue-jeaned suspect with a dark complexion.

Finally, the evidence also shows that although Avirett fully participated in the search of Melear's apartment, and stood armed at the door of Stewart's apartment while Officer Clark physically searched it, he made two written statements before the trial that he had *not* entered any of the apartments in the building.

## III. DISCUSSION

Avirett's arguments in this matter are tied to the factual record. He contends that the jury reached its conclusions based on insufficient evidence. Avirett maintains (1) that he is entitled to qualified immunity in his personal capacity under the circumstances of this case according to the standards of *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); (2) that he is entitled to qualified immunity with respect to the Stewart search because of his role as a back-up; (3) that his conduct in the search of Carrie Melear's apartment did not violate the Constitution and cannot form the basis for Section 1983 liability; and (4) that he should not have been assessed punitive damages because his conduct was not sufficiently reckless or malicious under the standards of *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed. 2d 632 (1983). We shall address Avirett's contentions in turn.

A. Standards of Review.

▇ We pause to consider a preliminary question—the scope of our review. The March 12, 1986 judgment in this case became final when the district court denied Avirett's motions for judgment NOV or a new trial, and his motion to alter or amend the judgment, on August 21, 1987. We review denials of motions for a new trial and to alter or amend a judgment under an abuse of discretion standard. *Ellis v. Chevron U.S.A., Inc.,* 650 F.2d 94, 97 (5th Cir.1981); *Weems v. McCloud,* 619 F.2d 1081, 1098 (5th Cir.1980). In substance, however, Avirett is asking us to reverse the judgment of the district court because it let a jury verdict stand that Avirett believes is not supported by the evidence.[3]

▇ Reviewing a denial of a JNOV motion in these circumstances requires us to inspect factual determinations by the jury, but we characterize a claim that a verdict is based on insufficient evidence as a question of law, thus justifying our scrutiny of the record. *See United States v. Bucon Construction Company,* 430 F.2d 420, 423 (5th Cir.1970). "In reviewing ... [the denial of a motion for judgment notwithstanding the verdict] our inquiry matches the inquiry undertaken by the trial court in passing on [the motion]: whether the evidence, viewed in the light most favorable to the nonmoving party, is such that reasonable men could not arrive at a contrary verdict." *Keyes v. Lauga,* 635 F.2d 330, 334 (5th Cir.1981) (citation omitted). This Circuit has articulated such a "reasonable person" standard in other substantively identical forms. *Ellis v. Chevron,* 650 F.2d at 96–97; *Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc).

Aware of our tools and their limitations, we proceed to the legal questions awaiting adjudication.

B. Qualified Immunity.

▇ Avirett argues that he is entitled to qualified immunity in his personal capacity regarding the claims of both Stewart and Melear. He asserts that a reasonably competent police officer, under the facts of this case, could have believed that probable cause existed to enter the Melear apartment building and search individual apartments inside.[4]

▇ Avirett relies on, and we are guided in part by, the Supreme Court's decision in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). As we shall see, however, Avirett significantly misconstrues *Anderson*'s meaning. In *Anderson,* Justice Scalia made clear that law enforcement officers are entitled to a qualified immunity defense in their personal capacities in civil rights actions based on alleged Constitutional violations.[5] He stated that

> [W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken.

*Anderson,* 107 S.Ct. at 3038 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982)).

▇ This standard is entirely objective. *Anderson* instructs us that an officer's

---

3. Avirett did not move for summary judgment on the qualified immunity issue. This is important to note, as we shall make clear *infra*.

4. The Fourth Amendment requires both probable cause and a warrant before police may conduct a full-blown search, in the absence of narrowly-defined exceptions to the warrant requirement, such as the existence of exigent circumstances. But because the jury could have reached its conclusion solely by finding the absence of probable cause, we find it unnecessary to consider the secondary issue of whether there were exigent circumstances in this case.

5. The defendant in *Anderson* was an agent of the Federal Bureau of Investigation. Thus, the plaintiffs based their claim not on 42 U.S.C. § 1983, but on *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). However, it is pellucid that the qualified immunity defense is available in both *Bivens* and Section 1983 actions. *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978).

"subjective beliefs about the search are irrelevant." *Id.* at 3040. Thus, an objective standard allows many claims to be decided on summary judgment. It provides defendant officials "with the ability 'reasonably to anticipate when their conduct may give rise to liability for damages,'" and offers a means of avoiding the protracted and time-consuming processes of litigation. *Id.* at 3042 (citations omitted).

*Anderson*'s import arises substantially from the procedural status of the case. The plaintiffs sued Anderson, an FBI agent, under 42 U.S.C. § 1983, seeking damages for the warrantless search of their home. Before any discovery took place, Anderson moved for summary judgment, asserting that he was entitled to qualified immunity. The district court granted summary judgment, "holding that the undisputed facts revealed that Anderson had probable cause to search the Creightons' home and that his failure to obtain a warrant was justified by exigent circumstances." 107 S.Ct. at 3037–38. The Eighth Circuit reversed. It held that there were disputed facts that made summary judgment improper. It also held that summary judgment was unwarranted because the Creightons' Fourth Amendment right to be free from warrantless searches, unless the searching officers had probable cause to search and exigent circumstances justified the search, was clearly established. *Id.* at 3038.

The Supreme Court vacated the judgment of the Eighth Circuit and remanded for further proceedings. The Court's opinion addresses the Eighth Circuit's determination that summary judgment was unwarranted because the Creightons' Fourth Amendment rights were clearly established. Justice Scalia stated that such an approach "would turn a guarantee of immunity into a rule of pleading." *Id.* at 3039. He therefore explicated the *Harlow* standard further. *Anderson* informs us that "the operation of this standard ... depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified," *id.* at 3038, and that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing would violate that right.... [This] is to say that in the light of preexisting law the unlawfulness must be apparent." *Id.* at 3039; *see Matherne v. Wilson*, 851 F.2d 752 (5th Cir.1988); *Hodorowski v. Ray*, 844 F.2d 1210, 1216–17 (5th Cir.1988).

Because the notion of "probable cause" is inherently abstract, and gains meaning only from particular circumstances—much like the fact that "reasonableness" in a common law tort suit for negligence gains its meaning from particular circumstances—the Court refined further, at least in the Fourth Amendment context, the *Harlow* test.[6] *Anderson* states that "the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials." *Id.* at 3040.

In other words, a district judge must decide at the summary judgment stage the meaning of "probable cause" in light of a case's particular facts. The Eighth Circuit was reversed because it defined the legal right at a level too abstract to have meaning in cases where slight variations in factual scenarios may constitute the difference between constitutionality and unconstitutionality, or immunity and the absence of immunity. In effect, at least in probable cause cases, the two-part *Harlow* test collapses because the relevant law concerning probable cause, at the level of specificity required by *Anderson*, only carries mean-

---

**6.** *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983) ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules"); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) ("In dealing with probable cause, ... we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act").

ing when it is given content by the particular facts of a case.

■ A district judge may determine that a factual dispute exists that precludes summary judgment, *see Reardon v. Wroan,* 811 F.2d 1025, 1030 (7th Cir.1987), or, as in this case, a defendant may fail to or choose not to move for summary judgment. In these instances, the policies encouraging pretrial, speedy immunity determinations— in particular, the policy favoring avoidance of the processes of litigation—do not apply, of course. At this point, then, the trier of fact must determine the objective legal reasonableness of an officer's conduct by construing the facts in dispute.[7] In this case, the jury performed such a function after being instructed properly on the applicable legal standard by the trial judge. To the extent that it is possible to give separate meaning to the "clearly established" prong of the *Anderson/Harlow* test in probable cause cases that proceed to trial, the clarity of the law is embodied in the court's charge to the jury. Averitt does not attack the jury charge. He attacks the jury verdict

asserting there is insufficient evidence to support it. All we must do, then, is to determine whether sufficient evidence supports the jury's conclusion that no reasonable officer could have believed there was probable cause to search in this case.

■ Despite the fact-specific nature of our inquiry, the appellant would have us hold that two cases existing in May, 1984 demonstrate that the law was not clearly established at that time, and that reasonable officers could differ concerning whether probable cause existed in this case.[8] In fact, these cases demonstrate no such thing. The fact-specific nature of a probable cause inquiry, whether it goes to immunity or the substantive constitutional violation, is not aided significantly by poring over cases that are characterized by their distinctive factual characteristics. In *Archibald v. Mosel,* 677 F.2d 5, 6 (1st Cir. 1982), the police conducted a warrantless search of the plaintiffs' apartment for a robber. The court held that the search was constitutional because there were exigent circumstances justifying entry into the

---

7. As the trier of fact, the jury could properly determine the reasonableness of Avirett's actions after being instructed according to the *Anderson/Harlow* standard. *See Thorsted v. Kelly,* 858 F.2d 571 (9th Cir.1988); *Schlegel v. Bebout,* 841 F.2d 937, 945 (9th Cir.1988); *but see Llaguno v. Mingey,* 763 F.2d 1560, 1569 (7th Cir.1985), *cert. dismissed,* 478 U.S. 1044, 107 S.Ct. 16, 92 L.Ed.2d 783 (1986); *Moore v. Marketplace Restaurant, Inc.* 754 F.2d 1336, 1358, 1361 (7th Cir.1985) (Judges Posner and Gibson creating a panel majority on the issue); *see id.* at 1358 (Posner, J., concurring in part and dissenting in part) ("[I]f there was no probable cause, there was no immunity; if there was probable cause ... there was immunity); *Warren v. City of Lincoln,* 816 F.2d 1254, 1261 (8th Cir.1987); *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 561 (1st Cir.1988). *Anderson,* which holds that a police officer may violate the Fourth Amendment but still be entitled to qualified immunity, 107 S.Ct. at 3041, *see also Griffon v. HHS,* 832 F.2d 51, 52 (5th Cir. 1987), undermines a related aspect of Judge Posner's reasoning. *See Llaguno,* 763 F.2d at 1569 ("To ... instruct the jury ... that even if the police acted without probable cause they should be exonerated if they reasonably (though erroneously) believed that they were acting reasonably is to ... give the defendants two bites at the apple"); *Anderson,* 107 S.Ct. 3043, 3052, n. 20 (Stevens, J. dissenting).

*Anderson* does not create an exception to the standard of review applicable to JNOV motions. Thus, if a qualified immunity defense goes to the jury, and the verdict is attacked for insufficiency of the evidence, the jury's determination of objective legal reasonableness under *Anderson*'s guidelines is simply to be reviewed just as any other jury determination is scrutinized under the deferential standard enunciated in *Keyes v. Lauga,* 635 F.2d at 334, and similar cases.

8. *Anderson* requires that we look no later than the time of the search to find applicable law in a qualified immunity inquiry. 107 S.Ct. at 3038.

As a general proposition, we will not rigidly define the applicable body of law in determining whether relevant legal rules were clearly established at the time of the conduct at issue. *See Harlow v. Fitzgerald,* 102 S.Ct. at 2738, n. 32. Relying solely on Fifth Circuit and Supreme Court cases, for example, would be excessively formalistic, but they will loom largest in our inquiries. In determining what the relevant law is, then, a court must necessarily exercise some discretion in determining the relevance of particular law under the facts and circumstances of each case, looking at such factors as the overall weight of authority, and the status of the courts that render substantively relevant decisions, as well as the jurisdiction of the courts that render substantively relevant decisions.

apartment. The court implicitly held that probable cause existed for the search. Unlike the searches in this case, the police in *Archibald* broke into the apartment only after the person who had been robbed called the police and very specifically told them "that he had just chased the robber into apartment 2005 at 300 Ruggles Street, a half-block away." 677 F.2d at 6. *Archibald* determined that probable cause existed because of the specificity of the information possessed by the searching officers. Thus, the only substantial commonality between *Archibald* and this case is that both involve searches implicating the Fourth Amendment.

Avirett also relies on *United States v. Scott*, 520 F.2d 697 (9th Cir.1975), *cert. denied*, 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976). It is similarly inapposite. In *Scott*, the court upheld a conviction for bank robbery, holding a warrantless search of an apartment building constitutional. Again, unlike in the present case, the police in *Scott* possessed detailed information suggesting that the defendants were in the apartment house. 520 F.2d at 699. Avirett has not cited, and we have not discovered, a case suggesting that police officers may lawfully or reasonably break down apartment doors and search homes when they are not even certain whether a suspect is in the building containing the apartments, a conclusion that the jury in this case could properly have concluded from the evidence, as we discuss next.[9]

■ There is overwhelming evidence in this case suggesting that no reasonable officer in 1984 could have believed that he or she had probable cause to search the apartments of Carrie Melear and Willie Stewart. The jury could properly have found from the evidence that the officers knew only that the suspect was running *toward* the Melear apartment building. The only evidence suggesting that the suspect ran *into* the building is Officer Clark's. The jury was entitled to have disbelieved Officer Clark. In addition, other evidence demonstrates that Mrs. Porras denied giving him such information the next day. Moreover, no testimony indicates that Mrs. Porras was ever outside her yard, and there is testimony which shows that one could not see the entrances to the Melear apartment building from her yard. Finally, because there were two entrances to the building, the suspect could have run in one entrance and out the other, even assuming he had gone into the building.

Under these circumstances, the jury could properly have concluded that no reasonable officer could have known whether the suspect was even in the Melear apartment building. Based on this permissible determination, it is a short step to conclude objectively that a reasonable officer could not believe that he or she had probable cause to break down apartment doors in a building when one could only have speculated broadly about whether the suspect was even inside the building. Thus, the law was "clearly established" under the circumstances of this case, and the jury's decision that Avirett's conduct was objectively unreasonable must remain untouched.

### C. Liability as Participant in the Searches.

Avirett also argues that the jury fundamentally erred by finding him liable under

---

**9.** *Compare Matherne v. Wilson*, 851 F.2d 752 (5th Cir.1988). *Matherne* is an immunity case where factual minutiae were not outcome determinative, and the clarity of the applicable legal norms in the case could be successfully determined under the facts by reference to earlier decisions. In *Matherne*, we held that a sheriff was entitled to qualified immunity under Section 1983. He had fired the plaintiff, a deputy, who had campaigned for the sheriff's political opponent. In *Matherne*, the law was not sufficiently clear at the time of the sheriff's conduct that a reasonable sheriff should have known that he could not fire a subordinate for engaging in the political activity at issue. The relevant legal norms that determined whether a nonpolicymaking employee had a clear First Amendment right to engage in political activity were unclear at the time in question. Thus, in *Matherne*, the *threshold* test in the *Anderson/Harlow* standard concerning the clarity of the law was not met, and the sheriff was therefore entitled to immunity.

Section 1983 for violating the Fourth Amendment rights of Stewart and Melear. First, he contends that because he "never kicked in the door, entered [Stewart's] apartment [or] searched the room," he is entitled to qualified immunity with respect to Stewart's claims under an alternative rationale that he was merely a "back-up participant" in the Stewart search. Appellant's Brief at 21–22. Substantively, Avirett is arguing that he did not commit a constitutional violation because he participated less actively than Officer Clark in the Stewart search, not that he is entitled to qualified immunity because he did not commit the physical acts of damage during the Stewart search. The jury permissibly determined that the participants in the illegal searches were not entitled to qualified immunity. Thus, the question Avirett really poses is whether his conduct falls within the scope of the illegal search of Stewart's apartment.

▄▄▄ Avirett's attempt to evade liability for the Stewart search fails to recognize the nature and scope of a Fourth Amendment violation. He was a full, active participant in the search, not a mere bystander. *See Creamer v. Porter*, 754 F.2d 1311, 1316–17 (5th Cir.1985). Avirett proceeded to Stewart's door with Clark, and stood at the door armed with his gun while Clark went into the apartment. Both men thus performed police functions that were integral to the search. Because the jury could properly have found that the search was unconstitutional, it was also justified in finding both officers liable for their integral participation in the violation.

The appellant argues, in a similar vein, that the evidence shows he committed no more than common law torts of trespass and assault in the search of Carrie Melear's apartment. Avirett's argument conflates two inquiries, one that involves an issue of severity of injury and one that does not. The first inquiry asks whether particular alleged injuries rise to the level of a constitutional violation that predicates Section

1983 liability. This occurs, for example, in excessive force cases under the due process clause of the Fourteenth Amendment. *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir.1981); *Johnson v. Moral*, 843 F.2d 846 (5th Cir.1988) [en banc decision pending]. In other words, some acts that cause injury are not constitutional violations. The other inquiry, which we undertake in this Fourth Amendment case involving our review of a jury verdict, only asks whether a police search was based on probable cause. No issue exists concerning the severity or degree of an injury in a Fourth Amendment inquiry. An officer either conducts a search with probable cause or conducts a search without probable cause.

▄▄▄ As discussed above with respect to Avirett's qualified immunity defense, the jury properly could have concluded from the evidence that Avirett and his colleagues violated the Fourth Amendment by entering Melear's apartment without probable cause. In the absence of a successful defense, the existence of a Fourth Amendment violation sufficiently predicates Section 1983 liability. A plaintiff is entitled to at least nominal damages for such a violation of an absolute right. *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 2544 n. 11, 91 L.Ed.2d 249 (1986); *Carey v. Piphus*, 435 U.S. 247, 265–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978); *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir.1980). Avirett does not contend that Melear failed to prove actual, compensable injury. Nor does he maintain that the damages are excessive or disproportionate to the injury caused by the search of her apartment, a search that kept her at gunpoint.[10]

We conclude, therefore, that the jury was entitled to find Avirett liable for actual damages under Section 1983 for his role in the unconstitutional searches of both the Stewart and Melear apartments. While the difficulties of law enforcement are great, police investigations cannot be allowed to subordinate the rights of men and women

---

10. Avirett does not argue, and could not contend in good faith, that Carrie Melear voluntar-

ily consented to the search of her apartment.

under our Constitution. This principle runs deep in our jurisprudence, and we will stand by it until time has tolled its last bell.

### D. Propriety of Punitive Damages.

Finally, Avirett maintains that even if he is liable under Section 1983 for violating the Fourth Amendment rights of Stewart and Melear, the jury's award of punitive damages is not supported by sufficient evidence. The standard in this area is clear. "[A] jury may be permitted to assess punitive damages in an action under Section 1983 when the defendant's conduct ... involves callous or reckless indifference to the rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1649, 75 L.Ed.2d 632 (1983); *Hinshaw v. Doffer*, 785 F.2d 1260, 1270 (5th Cir.1985). Punitive damages awards serve the dual goals of punishing the defendant for his or her conduct and deterring others from engaging in similar behavior. *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986). The scope of our review remains strictly limited in the punitive damages context. *Longoria v. Wilson*, 730 F.2d 300, 305–06 (5th Cir.1984).

Based on the evidence in the record, a reasonable jury could have properly assessed punitive damages by finding that Avirett was recklessly indifferent to the rights of Stewart and Melear. The appellant played an active role in the frenzied searches. He played an integral role in the Stewart search, which frightened Stewart so much that he considered jumping out of his second story window. Avirett kept Carrie Melear at gunpoint as he participated in the search of her apartment. He had been drinking alcohol before the defendants responded to the initial report of a disturbance. He testified that he knew at the time he should not have responded to the call because he had been drinking alcohol. The jury could properly have concluded that Avirett was intoxicated. Moreover, Avirett testified that based on the information he possessed at the time of the searches, he should not have participated in them. A reasonable jury could have construed this evidence as demonstrating conduct that was recklessly indifferent to the rights of Stewart and Melear. Thus, the punitive damages award must stand as well.

## CONCLUSION

Like countless litigants before him, the appellant pleads his plaints to us, a court of appellate jurisdiction, asking us to reconstruct the evidence on which a jury based its determination. This task finds an appellate court treading on thin ice. But while the ice may be thin, our duty is to cross it, which we do with the greatest of care.

Our jurisprudence in this area, defined over time, has been settled by the passing of the years. Reversal is justified only when we can assure ourselves that the jury acted as no reasonable jury could. Because we do not require any verdict to define the contours of epistemological certitude, and because clearly sufficient evidence supports the jury's well-considered verdict in this case, the judgment below is AFFIRMED.

**PATRICK E. HIGGINBOTHAM,**
Circuit Judge, concurring:

I join Judge Goldberg's fine opinion for the court. I add this writing only to clarify my understanding of the qualified immunity doctrine that we apply today. Qualified immunity shields government officials from "civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.... [W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). A legal right is "clearly established" for purposes of this test only if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 3038.

When, as in this case, a § 1983 claim based upon an allegedly unconstitutional search goes to the jury, the qualified immu-

nity question remains distinct from the constitutional question of probable cause. This distinction manifests itself in two respects. First, it is possible for the jury to find that, although the actual circumstances of the search did not justify the officer's behavior, the circumstances *that appeared to the officer* would have justified a search. That is, the officer could make a constitutionally reasonable judgment based upon a factual misperception. Secondly, the jury could find facts which justify a conclusion that the Constitution has been violated, because the police officers lacked probable cause, without justifying a conclusion that an objectively reasonable officer would have understood that probable cause was absent.

In practice, these distinctions may on occasion be of little import at the appellate stage because of the just deference which reviewing courts owe to a jury's unexplained verdict. When, as in this case, the jury must choose between divergent accounts of the relevant facts, a single choice may resolve both the immunity and the constitutional issues. The jury might give so much credit to the defendant's account as to find no constitutional offense, or so little credit as to find both that a right was violated and that immunity was lost. Moreover, a reviewing court may be unable to determine whether the jury interpreted ambiguities in the evidence so unfavorably to the defendants as to make any constitutional violation unreasonable, or whether the jury's interpretation recognized only a reasonable mistake in an area where legal rules were not "clearly established." Only in this very limited sense can the two aspects of the *Harlow* test be said, in the language of the majority, to "collapse" in probable cause cases that go to the jury.[1]

Such a collapse is neither desirable nor inevitable. The trial judge may guard against the possibility of such a collapse both through appropriate jury instructions, as the majority proposes, and also by submitting specific interrogatories pursuant to Fed.R.Civ.P. 49. By directing the jury to return distinct answers to questions about illegal conduct and officer immunity, the court can focus the jury's attention on the factual disputes peculiar to each issue.

Even when the jury returns a general verdict, that in no way permits a reviewing court to ignore either of the distinctions developed above. In some cases, the evidence might suffice to support a jury verdict that, under the actual circumstances of the case, an officer's acts were unconstitutional, without sufficing to support a jury determination that the circumstances, *as they appeared to the officer at the time*, were such as to make the officer's acts unconstitutional. In other cases, it might be possible for the jury to resolve factual ambiguities so as to conclude that a constitutional violation took place, even though it is *not* possible for the jury to resolve factual ambiguities so as to conclude that the violation was the product of an objectively unreasonable mistake. For example, although in this case the evidence of drunkenness and irrational behavior permitted the jury to conclude that the officers acted recklessly and disregarded the rights of the plaintiffs, such a conclusion will not be possible in every § 1983 case.

Believing that all of these considerations are consistent with the views expressed by Judge Goldberg for the court, I concur in his opinion.