JENNIFER WALKER ELROD, Circuit Judge,
concurring only in the judgment:
I write separately to address Whitley’s § 1983 deliberate-indifference claim against Ranger Hanna. Taking Whitley’s allegations as true, Hanna made a conscious decision to allow a fifty-five-year-old law enforcement official to engage in predictable, preventable, and yet repeated sexual assaults on a fifteen-year-old participant in a law-enforcement-learning program. Thus, at this early stage of the case, I would hold that Whitley states a plausible § 1983 claim. I concur in the judgment, however, because Whitley cannot overcome Hanna’s assertion of qualified immunity.
I.
We must take Whitley’s allegations as true at this 12(b)(6) stage of the case. Bowlby v. City of Aberdeen, 681 F.3d 215, 219 (5th Cir.2012). Although the majority opinion offers a careful and thorough description of the complaint, some critical points bear repeating and, in some respects, reframing in the light most favorable to Whitley.
By January 2007, Hanna knew that Ariaz was a threat to the young female participants in the Explorer program. Although Hanna obtained credible evidence that Ariaz had kissed, fondled, sent numerous sexually suggestive text messages to, and expressed an intent to engage in “several different sexual acts” with his first victim (A.M.), Whitley alleges that Hanna “essentially stopped investigating.” Over the next several months, Whitley asserts that Hanna did nothing “to protect any of the young girls Ariaz was supervising.”
Shortly after A.M.’s complaint, Ariaz began “grooming” Whitley, a fifteen-year old Explorer student, to be his next victim. The relationship turned sexual in June 2007. Whitley alleges that, had Hanna *650 “actually investigated Ariaz ... [he] would have learned what Ariaz was up to and would have prevented him from abusing” her. But Hanna did not, in fact, learn of Ariaz’s conduct until July 3, 2007, when an officer with the Brownwood Police Department reported suspicious activity. Hanna quickly confirmed that Ariaz was “spending hours at a time alone with [Whitley] in the middle of the night,” often parked in known “make out” areas. Yet, says Whitley, Hanna did not seek “to separate the predator from his prey.”
To the contrary, Hanna decided to continue monitoring Ariaz to “catch him in the act of abuse.” To accumulate evidence for an eventual prosecution, Hanna and a Brownwood officer placed a GPS-tracking device on Ariaz’s car and installed surveillance cameras in the hallways of the Brownwood Annex, a common meeting place for Whitley and Ariaz. By July 12, 2007, Hanna had “video proof that [Whitley] was likely being abused.” Specifically, Hanna observed Ariaz kissing and hugging Whitley several times in the Annex hallway, entering a courtroom where Whitley was waiting, and exiting the same courtroom without his duty belt thirteen minutes later. Despite this knowledge, Hanna allegedly made no effort to “put a stop to the abuse.” Rather, says Whitley’s complaint, Hanna “continued to use [her] as bait to catch Ariaz in the act of sexual offense,” and thereby “knowingly allowed and provided substantial assistance to a fifty-five year old man to abuse a fifteen year old to better [his] chance at a conviction and make [his] investigation easier.”
Ariaz continued to abuse Whitley for days, with bits and pieces of his inappropriate conduct captured on Brownwood Annex video cameras. In the early morning of July 17, 2007, Hanna hid in the courtroom closet with another investigator, where he observed Ariaz positioned over Whitley in a “clearly inappropriate and sexual manner.” Hanna did not intervene to stop Ariaz’s conduct, but “remained at the Annex so that he would be more ready the next time to catch Ariaz in the midst of a more prolonged act.” Ariaz left the Annex with Whitley at around 2:30 in the morning. Hours later, at 6:13 a.m., Ariaz returned with Whitley; Hanna observed Ariaz kiss her for several minutes while she was lying down, and ultimately place his head in Whitley’s “crotch area.” Only then did Hanna emerge from the closet and place Ariaz under arrest.
Taking these allegations as true, I would conclude that Hanna plausibly acted with deliberate indifference to Whitley’s constitutional right to bodily integrity.
II.
As a threshold matter, there is no reasonable debate that Ariaz violated Whitley’s constitutional rights when he sexually assaulted her. We have long held that the Fourteenth Amendment affords a person “[t]he right to be free of state-occasioned damage to ... bodily integrity.” Doe v. Taylor Indep. Sch. Dist, 15 F.3d 443, 450-51 (5th Cir.1994) (en banc) (quoting Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir.1981)).[1] Sexual abuse by a state offi *651 cial is an undeniable violation of this liberty interest. See Taylor, 15 F.3d at 451 (“[SJurely the Constitution protects a schoolchild from physical sexual abuse — here, sexually fondling a 15-year old school girl and statutory rape — by a public schoolteacher. ... Thus, Jane Doe clearly was deprived of a liberty interest recognized under the substantive due process component of the Fourteenth Amendment.” (footnote omitted)). We have called it “incontrovertible” that a state actor violates bodily integrity when s/he sexually abuses a child; “such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment.” Id. (footnotes omitted).
Critically, the existence of an underlying constitutional violation differentiates this case from Gonzales and DeShaney, which examined the scope of a state official’s duty to interfere with private violence. See Town of Castle Rock v. Gonzales, 545 U.S. 748, 750-51, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (analyzing whether an individual had a constitutionally protected property interest in the enforcement of a state-law restraining order against a private party); DeShaney v. Winnebago Cnty. Dep’t of Soc. Servs., 489 U.S. 189, 195-96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (analyzing whether a child had a substantive due process right to protection from violent physical abuse by his father). As the Supreme Court explained in De-Shaney, the Fourteenth Amendment was enacted to “protect the people from the State, not to ensure that the State protected them from each other.” 489 U.S. at 196, 109 S.Ct. 998. Thus, although the substantive component of the Due Process Clause does not “requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors,” it does protect against “state-occasioned damage to a person’s bodily integrity.” Id. at 195, 109 S.Ct. 998; Taylor, 15 F.3d at 450-51 (citing Shillingford, 634 F.2d at 265) (emphasis added).[2]
Where, as here, a case involves an underlying constitutional violation like state-occasioned violence, the court must ask whether the state actor treated the violation with deliberate indifference. See Doe v. Rains Cnty. Indep. Sch. Dist., 66 F.3d 1402, 1413 (5th Cir.1995) (noting that, in *652 Taylor, “the supervisor’s failure to act, coupled with his deliberate indifference, was tantamount to a conscious decision to allow the alleged constitutional injury to occur or persist”); see also Taylor, 15 F.3d at 463 (Higginbotham, J., concurring) (“An omission that evinces deliberate indifference toward the violation of an individual’s constitutional rights may amount to an act that causes the violation.”).[3] My primary concern here is with the majority opinion’s approach to the deliberate indifference inquiry.
III.
The deliberate indifference standard is a high bar, but it is not insurmountable. At this stage, Whitley must plausibly allege that Hanna made a “ ‘conscious’ choice to endanger [her] constitutional rights.” Mesa v. Prejean, 543 F.3d 264, 274 (5th Cir.2008) (quoting Snyder v. Trepagnier, 142 F.3d 791, 799 (5th Cir.1998)). Taking Whitley’s allegations as true, that is precisely what happened here: Hanna decided to allow Ariaz, a state official, to continue sexually assaulting Whitley in the hopes of obtaining stronger evidence against Ariaz. Whitley contends that Hanna was well-aware of the risk to her at the time; the plan was predicated on the fact that Ariaz had abused, and would continue to abuse, his young Explorer student.[4] In other words, Hanna allegedly knew that Ariaz was “highly likely to inflict the particular injury” that Whitley suffered, and Hanna chose not to act. Cf. Brown v. Bryan Cnty., Okla., 219 F.3d 450, 461 (5th Cir.2000) (citation omitted).
Moreover, Hanna’s alleged conduct goes beyond mere haphazard or negligent investigation. The majority opinion analogizes Hanna’s behavior to that of the superintendent in Taylor, highlighting that Hanna immediately resumed his investigation (after months of stagnation) when he learned that Ariaz was cavorting with another minor in the Explorers program.[5] But Hanna’s conduct here is fundamentally different from that of the Taylor super *653 intendent. In Taylor, the superintendent took affirmative, albeit ineffective, steps to end the abuse. 15 F.3d at 457-58. He directed the principal to talk with the coach suspected of sexual abuse, contacted the victim’s parents, spoke with the victim, and verbally reprimanded the coach. Id. The purpose of these actions was to interfere with the alleged abuse, thereby mitigating the risk of continued constitutional injury. Id. Indeed, we distinguished the Taylor superintendent’s actions from those of the deliberately-indifferent school principal, who “failed to take action that was obviously necessary to prevent or stop” the abuse.[6] Id. at 457. We focused on the principal’s failure to take actions that may have “derailed the relationship.” Put another way, the constitutional violations would not have been as “severe or prolonged” absent his deliberate choice not to act. Id. If the Taylor principal’s nonfeasance is sufficient to show deliberate indifference, then Hanna’s allegedly purposeful subrogation of Whitley’s constitutional rights must be enough to survive 12(b)(6) dismissal.
The implicit message in the majority opinion’s deliberate-indifference analysis is that an officer can escape § 1983 liability for a conscious endangerment of a victim’s constitutional rights, provided that he acted with good intentions. For example, the majority opinion emphasizes that Hanna “had to decide what evidence would suffice to secure a conviction,” and notes Hanna’s commitment “to putting an end to Ariaz’s abuses once and for all.” But this ignores the fact that, in his zeal to put Ariaz behind bars for good, Hanna allowed — in fact, expected[7] — Whitley to suffer additional instances of sexual abuse at the hands of a fifty-five year old police officer. No matter how well-intended, investigatory and prosecutorial strategies must yield to the inviolable constitutional rights of those involved (typically the defendant, but here the victim).[8] “While the difficulties of *654 law enforcement are great, police investigations cannot be allowed to subordinate the rights of men and women under our Constitution. This principle runs deep in our jurisprudence, and we will stand by it until time has tolled its last bell.” Melear v. Spears, 862 F.2d 1177, 1186-87 (5th Cir.1989).
Moreover, the majority opinion’s deliberate-indifference analysis suggests that Hanna faced a binary choice: arrest Ariaz, or do nothing to intervene in the absence of conclusive evidence of abuse. See, e.g., Op. at 651 (“Hanna had to decide what evidence would suffice to secure a conviction.”).[9] It focuses on the fact that Hanna had only “[vjideo proof that [Whitley] was likely being abused,” which may not have been sufficient to obtain a conviction under the Texas Penal Code. But whether Hanna could or should have arrested Ariaz is an entirely different question from whether Hanna’s failure to intervene in state-occasioned violence constitutes deliberate indifference. The deliberate-indifference standard requires only conscious disregard to a “risk that a violation of a particular constitutional right ... will follow the decision.” Bd. of Cnty. Comm’rs of Bryan Cnty., Okl v. Brown, 520 U.S. 397, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (emphasis added) (analyzing the deliberate-indifference standard in the context of municipal liability, and evaluating whether a police officer’s use of excessive force would have been a plainly obvious consequence of the sheriffs hiring decision). In other words, as soon as Hanna knew that Whitley was in danger of further sexual abuse, he could not choose to ignore the risk, regardless of whether he had direct evidence for a conviction.
In short, while Hanna may have preferred perfect proof of Ariaz’s sexual abuse, video or eyewitness evidence was by no means a mandatory prerequisite to Whitley’s rescue. I would hold at this preliminary stage that Hanna’s alleged deliberate choice to prioritize Ariaz’s eventual prosecution over Whitley’s immediate safety plausibly constitutes deliberate indifference to a known risk of constitutional violations.
IV.
Of course, the inquiry does not end with the plausibility of Whitley’s § 1983 claim, as Hanna asserted a qualified-immunity defense. “Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was ‘clearly established’ at the time of the challenged conduct.” Ashcroft v. al-Kidd, *655 - U.S. -, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011).
Relevant here is the second prong of the inquiry: whether the constitutional right at issue was “clearly established” at the time of the challenged conduct. Id. In considering this prong, the court asks whether the law so clearly and unambiguously prohibited his conduct that “every ‘reasonable official would understand that what he is doing violates [the law].’ ” Id. at 2083 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The court will not deny immunity unless “existing precedent ... placed the statutory or constitutional question beyond debate.” Id. at 2083. This doctrine protects “all but the plainly incompetent or those who knowingly violate the law.” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
The “clearly established” requirement does not depend on the existence of a case directly on point, however. See al-Kidd, 131 S.Ct. at 2083; see also Safford Unified Sell. Dist. No. 1 v. Redding, 557 U.S. 364, 377, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) (“To be established clearly, however, there is no need that the ‘very action in question [have] previously been held unlawful.’ ” (quoting Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999))). “Rather, ‘[t]he central concept is that of fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the eases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.’ ” Morgan v. Swanson, 659 F.3d 359, 412-13 (5th Cir.2011) (en banc) (Elrod, J., dissenting) (quoting Kinney v. Weaver, 367 F.3d 337, 350 (5th Cir.2004) (en banc)) (internal quotation marks omitted). The fair notice requirement is satisfied if controlling authority — or a “robust ‘consensus of persuasive authority’ ” — defines the contours of the right in question with a high degree of particularity. See al-Kidd, 131 S.Ct. at 2083 (quoting Wilson, 526 U.S. at 617, 119 S.Ct. 1692).
Here, I would hold that Hanna lacked fair notice that his conduct would amount to a constitutional violation.[10] Although there is no debate that a child has an inviolable right to bodily integrity, see supra Part II, our case law regarding an individual’s obligation to intervene in incidents of child sexual abuse arises almost exclusively in the context of school officials. See Taylor, 15 F.3d at 450-51; Rains, 66 F.3d at 1413. The other analogous body of law arises in bystander-liability cases, in which we require both actual presence at and acquiescence in the underlying constitutional violation. See Hale v. Townley, 45 F.3d 914 (5th Cir.1995). There simply is not enough controlling or persuasive authority to conclude that every reasonable official in Hanna’s position would understand that what he was doing violated the law. For that reason, Hanna is entitled to qualified immunity.
V.
This case is about a state actor’s knowing, deliberate choice not to intervene despite a substantial risk of continued statu *656 tory rape by a public official, in hopes of obtaining direct evidence for a conviction. While the underlying law-enforcement goal may be laudable, it must bend where a constitutional right is in play. Therefore, I would hold that Whitley states a plausible deliberate-indifference claim under § 1983. Nevertheless, I concur in the judgment because Hanna is entitled to qualified immunity.

. As the Fourth Circuit explained, ‘‘[t]he existence of this right to ultimate bodily security ... is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process. Numerous cases in a variety of contexts recognize it as a last line of defense against those literally outrageous abuses of official power....” Hall v. Tawney, 621 F.2d 607, 613 (4th Cir.1980). For example, in a case involving rape by a police officer after a traffic stop, the Eighth Circuit emphasized that the officer’s sexual assault “was a violation of the most intimate kind of bodily integrity,” and concluded that the district court did not err in concluding that the officer’s "egregious sexual violation” deprived the victim of a due process right. Rogers v. City of Little Rock, 152 F.3d 790, *651 796 (8th Cir.1998). In a case with nearly identical facts, the Fourth Circuit described the due process right at issue as a "right ... not to be subjected by anyone acting under color of state law to the wanton infliction of physical harm.” Jones v. Wellham, 104 F.3d 620, 628 (4th Cir.1997).

. The Supreme Court has cautioned that the Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.” Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Instead, for the conduct of a state actor to give rise to liability under the Due Process Clause, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.” Id. at 847 n. 8, 118 S.Ct. 1708 (citing Washington v. Glucksberg, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). In many contexts, what shocks the conscience is "deliberate indifference.” Id. at 851, 118 S.Ct. 1708; see Hernandez ex rel. Hernandez v. Tex. Dep’t of Protective & Regulatory Servs., 380 F.3d 872, 880 (5th Cir.2004) ("Consistent with those principles [in Lewis'], we have generally required plaintiffs to demonstrate that ‘the defendant state official at a minimum acted with deliberate indifference toward the plaintiff.' ” (citation and internal quotation marks omitted) (collecting cases)). "As the very term ‘deliberate indifference’ implies, the standard is sensibly employed only when actual deliberation is practical.” Lewis, 523 U.S. at 851, 118 S.Ct. 1708 (citing Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)); see Brown v. Nationsbank Corp., 188 F.3d 579, 592 (5th Cir.1999) (applying a deliberate-indifference standard where "the FBI made decisions which harmed the Plaintiffs after ample opportunity for cool reflection”).

.For example, in the context of alleged abuse to foster children, we have held that "an obvious showing that state social workers exhibited a conscious disregard for known severe physical abuses in a state-licensed foster home by itself sufficiently demonstrates deliberate indifference to a child's right to personal security.” Hernandez, 380 F.3d at 881 (concluding that two social workers did not act with deliberate indifference where, after an investigation, both concluded that there was no substantial risk to the children at issue). We have allowed a deliberate-indifference claim against hospital officials who turned a blind eye to a subordinate’s alleged intentional poisoning of patients. Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 256 (5th Cir.2005) (holding that plaintiffs sufficiently pled deliberate indifference against two supervisors who allegedly "knew both that a dangerous drug was missing and that patients were dying at an unusually high rate,” and noting that although they "could have investigated the deaths and missing drugs or changed hospital policy, they did nothing for a considerable period of time”).

. This is especially true in light of A.M.’s prior complaints about Ariaz's conduct and the information Hanna obtained in the very early stages of his investigation regarding Whitley. Moreover, Hanna himself observed Whitley and Ariaz engaging in sexually suggestive behavior at the Brownwood Annex. Thus, there is no question that Hanna was aware of the risk to Whitley's constitutional rights.

. The majority opinion emphasizes that Hanna could have conducted the investigation differently by, for example, moving at a faster pace, or placing video cameras in the courtroom (rather than the public hallway) of the Brownwood Annex. But it concludes that such mistakes are not enough to plausibly support § 1983 liability. If Whitley's claim turned on arguably minor investigatory failures in a typical criminal investigation, I would agree wholeheartedly. But it does not. Rather, Whitley’s allegations center on Hanna’s deliberate choice to prolong the risk of constitutional injury for the perceived greater good of Ariaz’s conviction.

. Moreover, the Taylor superintendent was new to the school, and had no prior knowledge of the teacher’s behavior. Still, he acted immediately when he learned of the abuse. Here, on the other hand, Hanna declined to complete his investigation of A.M.’s complaint and then, after learning that Ariaz was likely abusing Whitley, decided to allow the abuse to continue.

. Indeed, Hanna's plan did more than just allow Ariaz to continue to abuse Whitley; rather, it required further acts of sexual abuse before Hanna would arrest Ariaz or directly intervene. For example, Whitley alleges that "[Hanna] observed Plaintiff sitting or lying on a table with Ariaz positioned over her in a clearly inappropriate and sexual manner” at or near 2:30 a.m. on July 17, 2013. The majority opinion’s fíne parsing of this allegation extends beyond the requirements of Twombly and Iqbal. Certainly, Hanna was aware of a substantial risk to Whitley’s constitutional rights when he saw Ariaz positioned over Hanna in a “clearly inappropriate and sexual manner.” Whitley alleges that, despite this known risk, Hanna allowed the contact to continue.

.As Whitley's counsel rightly noted at oral argument, there are many tactics that an officer could employ to secure stronger evidence in the course of an investigation; a coerced confession, an illegal search, an improper wiretap, and so on. See, e.g., Crawford v. Washington, 541 U.S. 36, 69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (reversing the judgment of the Washington Supreme Court based on the unconstitutional denial of a defendant’s Sixth Amendment right to confront a witness against him); Kyles v. Whitley, 514 U.S. 419, 454, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (reversing a defendant's conviction and remanding for a new trial based on the state’s unconstitutional failure to turn over exculpatory evidence); Blackburn v. Alabama, 361 U.S. 199, 211, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) (reversing a robbery conviction of a mentally incompetent defendant after his confession was found to be involuntary and in violation of the Fourteenth Amendment); Giordenello v. United States, 357 U.S. 480, 488, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) (reversing a conviction for the possession of narcotics when the arrest warrant lacked probable cause in violation of the Federal *654 Rules of Criminal Procedure); see also Wilson v. Lawrence Cnty., 260 F.3d 946 (8th Cir.2001) (holding that a defendant could state a § 1983 claim where “a reasonable factfinder could determine that Defendants recklessly or intentionally chose to force Wilson to confess instead of attempting to solve the murder through reliable but time consuming investigatory techniques designed to confirm their suspicions,” and noting that there is "no counterveiling equally important governmental interest that would excuse the appellants from fulfilling their responsibility”). We bar law enforcement from this conduct because, no matter how valuable the conviction, the constitutional rights at issue are paramount. See Blackburn, 361 U.S. at 206, 80 S.Ct. 274 ("As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence.”).

. See also Op. at 645 ("Thus, although we easily can imagine some alternatives to the choice that Appellees made — including confronting Whitley or contacting her parents— the fact remains that Appellees successfully brought about Ariaz’s arrest approximately two weeks after Hanna first learned of a potential relationship between Ariaz and Whitley.”).

. The court looks not to whether the underlying constitutional violation is clearly established, but rather to whether an officer would have known that his conduct in addressing— or failing to address — the underlying violation, in and of itself, creates a constitutional injury. See, e.g., al-Kidd, 131 S.Ct. at 2084 (explaining that "[t]he general proposition ... that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established” (citing Saucier v. Katz, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Wilson, 526 U.S. at 615, 119 S.Ct. 1692)).