**Melvin FREITAS, Jr., Plaintiff,**

v.

**Ryan M. STONE, Matthew Manuma, John Does 1–10, Jane Does 1–10, and Doe Government Entities 1–10, Defendants.**

No. 92–00436.

United States District Court,
D. Hawaii.

April 15, 1993.

Stanford H. Nakamoto, Stephen Y. Arakawa, Kiuchi Nakamoto & Ahu, Honolulu, HI, for plaintiff.

Steven S. Michaels, Atty. Gen., Robert A. Marks, State Atty. Gen., Thomas D. Farrell, Attorney General Office, Honolulu, HI, for defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR STAY

DAVID ALAN EZRA, District Judge.

The court heard defendants' motion for summary judgment or, in the alternative, for stay on April 12, 1993. Stanford Nakamoto, Esq. appeared on behalf of plaintiff. Steven Michaels, Esq. and Thomas Farrell, Esq. appeared on behalf of defendants. After reviewing the motion and the supporting and opposing memoranda, the court DENIES defendants' motion for summary judgment and GRANTS defendants' motion for stay pending appeal.

### I. Background

In 1988, Melvin Freitas was a prisoner at the Halawa Medium Security Facility in Honolulu. This case arises from three related incidents that occurred at the end of that

year and, according to Freitas, resulted in his being subject to an unconstitutional beating. Though the facts surrounding these three altercations are disputed, there can be no uncertainty that prisoners and guards alike are well-skilled in the use of invective.

Shortly before noon on December 26, Freitas became involved in a verbal dispute with Ryan Stone, an adult correctional officer. While being escorted to his housing module after an early lunch, Freitas fell out of line from the group of inmates with whom he was travelling. Stone ordered Freitas to step back in place. Freitas alleges that the following conversation ensued:

> Stone: What, bra, you understand English? You know what is two line?
>
> Freitas: Hey, of course, I know what is two line.
>
> Stone: What, bra, you getting wise with me?
>
> Freitas: Hey, you know what, I not getting wise with you.
>
> Why you talking to me like that? Why you no talk to this guy like that? You seen him come in the middle of me.
>
> Stone: You know what, Freitas, you just one fuckin' punk.
>
> Freitas: Whoa, whoa, whoa. Bra, if anybody is one punk, you the punk.

Deposition of Melvin Freitas, Plaintiff's Memorandum in Opposition, R. 28 (hereinafter "R. 28"), at 16–17. Freitas alleges that Stone added the following final ominous comment a short time later: "We going see who the punk is when we get back to the module." *Id.* at 18.

Officer Stone told his superior officer, Matthew Manuma, that there had been trouble in the chow line. Manuma ordered Stone to counsel Freitas for the lunchtime incident, and at approximately 11:30 a.m. he and Stone escorted Freitas to a counseling office in the module.

Freitas alleges that the officers closed the curtain to the office, that Stone undressed partially, and made several abusive statements with the intent of starting a fight. Fearful that he would be attacked, Freitas left the office, but was coaxed back inside. He alleges that he was subsequently grabbed

by the neck, pushed against a wall, and thrown on a chair. Freitas states that his forearm was injured as a result of the alleged beating.

The officers' version of the counseling incident is quite different. They claim that Freitas was repeatedly insubordinate, that he tried to instigate a fight, and that he threatened Stone by warning him that he would catch him on the outside after he was paroled. Defendants' Memorandum in Support of Motion For Summary Judgment, or, in the Alternative for Stay, R. 21 (hereinafter "R. 21") at 508. Manuma concedes that he forced Freitas into a chair, but states that he did so only after Freitas improperly left the counseling office and yelled to the officers, "C'mon right now. You fucking punk. Don't take me in the office where you guys can mob me. Come out here where there's room and I can dance around that fat fucks [referring to Stone]." *Id.*

Near the end of the session, Freitas said, "Eh, sarge [Manuma], I like go with this fucka [again, referring to Stone in a kindly manner], but first I like one paper for sign so that when I pau [1] broke this punk's ass you guys no throw me in the hole [special holding unit]." *Id.* Freitas' version of the comment is only slightly different, but he contends that it was made only in response to Stone's incessant taunting. Defendants claim that Freitas' comment was just one in a litany of statements attempting to provoke a fight.

Manuma ordered that Freitas be transferred to the special holding unit and instructed Freitas to go back to his cell and collect his things. Fifteen minutes later, Manuma, Stone, and Thor Salona escorted Freitas, who was not restrained in any manner, to the special holding unit. Manuma opened the door to the unit and the most serious of the day's three alleged altercations began.

Freitas contends that, once inside the unit, Stone rushed him from behind. The momentum of Stone's lunge carried him to the floor, but he rebounded quickly, had at Freitas again, and pinned him against the wall punching him repeatedly in the body. Freitas grabbed Stone's testicles in an attempt to defend himself. Understandably enraged,

---

1. "Pau" is Hawaiian for finished or done.

Stone threw Freitas to the ground and began to punch him in the face. After the beating stopped, Freitas alleges that Stone gave him a few kicks to the head for good measure. All the while, Manuma allegedly did nothing.

Freitas states that he was taken to the special holding unit solely to ensure a private beating. He notes that the investigating correctional officer, Glenn Kakuda, determined that correctional officers from the search and escort team should have been called to escort Freitas to the holding unit because of the previous trouble among Freitas, Manuma, and Stone. R. 28, Exh. 2 at 478. Kakuda also determined that Stone and Manuma also should have placed restraints on Freitas while escorting him to the special holding unit. *Id.* Freitas alleges that the sole reason he was not restrained was so Stone and Manuma could beat him and claim that he had started the fight. Freitas Declaration, ¶ 4.

Stone's version of the fight is quite different. Stone states that Freitas began to walk quickly once inside the holding unit. In response, he ordered Freitas to slow down. Freitas dropped the bag of property that he was carrying, turned, and said, "C'mon let's go." Stone states that Freitas then charged him causing his head to strike against the wall. He successfully subdued Freitas, but only after the prisoner succeeded in causing him significant pain. R. 21 at 322–23. That point is not in dispute.

As a result of the alleged beating, Freitas contends that he suffered lacerations of the face, a puncture wound below the lower lip, bruises to his head and upper body, a cracked tooth, a bite wound to his left hand, a loss of hearing that required surgery, and a considerable amount of emotional distress. He concedes that he had a preexisting punctured eardrum, but states that this injury was not bothering him before the alleged beating. R. 28, Exh. 1 at 80–85, Exh. 2 at 414, 474, 481–82, and Exh. 4 at 63–70.

Freitas was subsequently found guilty of refusing to obey orders of a staff member, but he was acquitted on the more serious charge of assaulting any person. R. 21 at 322. Stone filed a criminal complaint against Freitas for assault and terroristic threatening, but the police refused to charge Freitas

at least partially on the basis of his successful completion of a polygraph examination. R. 28 at 67–69.

Freitas commenced this action under 42 U.S.C. § 1983. The matter is currently before the court on defendants' motion for summary judgment.

## II. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

■ The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The movant must be able to show "the absence of a material and triable issue of fact," *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987), although it need not necessarily advance affidavits or similar materials to negate the existence of an issue on which the nonmoving party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. *But cf., Id.*, at 328, 106 S.Ct. at 2555 (White, J., concurring).

■ If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support his legal theory. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on his pleadings, nor can he simply assert that he will be able to discredit the movant's evidence at trial. *See T.W. Elec.*, 809 F.2d at 630. Similarly, legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60

L.Ed.2d 241 (1979). Moreover, "if the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Building Products v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)) (original emphasis).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Eisenberg*, 815 F.2d at 1289.

■ However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec.*, 809 F.2d at 631. Also, inferences from the facts must be drawn in

the light most favorable to the nonmoving party. *Id.* These inferences may be drawn both from underlying facts that are not in dispute, as well as from disputed facts which the judge is required to resolve in favor of the nonmoving party. *Id.*

### III. Analysis [2]

#### A. *Qualified Immunity Standard*

■ When a law enforcement officer asserts qualified immunity from liability, the district court must determine whether, in light of clearly established principles governing the conduct in question at the time it occurred, the officer could have reasonably believed that his conduct was lawful. See *Hunter v. Bryant*, ─── U.S. ───, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Act Up!/Portland v. Bagley*, 971 F.2d 298, 300 (9th Cir. 1992).

■ A two-part analysis is employed in determining whether this standard is satisfied. First, the court must determine whether the law governing the official's conduct was clearly established. Second, under that law, the court must determine whether a reasonable officer could have believed the conduct was lawful.[3] *Hemphill v. Kincheloe*, 987 F.2d 589, 592 (9th Cir.1993); *Act Up!*, 971 F.2d at 301.

---

**2.** Freitas states that "[t]his action arises under federal law, particularly Title 42, Section 1983, 1985 et seq. of the United States Code and Fourth, Sixth, Thirteenth and Fourteenth Amendments of the United States Constitution." *Complaint*, R. 1 at ¶ 5. Though not explicitly stated in the complaint, all parties have proceeded as if an Eighth Amendment claim is also before the court. For that reason, and because the complaint is sufficiently broad to include the Eighth Amendment as a basis for relief, the court considers the Eighth Amendment in addition to the provisions explicitly relied upon by Freitas.

**3.** Until the Ninth Circuit's opinion in *Act Up!*, the question of whether an agent acted reasonably under settled law in the circumstances was a question for the jury. *See e.g. Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1467 (9th Cir.1984) ("although the antecedent inquiry, whether legal rights have been settled, may often best be resolved by the trial judge, the existence of a reasonable belief that a search is lawful, viewed in the light of the 'settled' nature of the law, is a question for the trier of fact") (citation omitted); *Schlegel v. Bebout*, 841 F.2d 937, 945 (9th Cir. 1988) ("The existence of a reasonable belief that their conduct was lawful, viewed in the light of clearly established law, is a question for the trier

of fact"). A complete set of citations on the prior treatment of the second prong of the qualified immunity test in the Ninth Circuit is set forth in Judge Norris's dissent from the failure of the court to hear case en banc. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 874 at n. 1 (1993).

In *Act Up!*, the Ninth Circuit abandoned this well-established rule on the basis of its conclusion that "[t]he Supreme Court rejected this approach in *Hunter v. Bryant*, ─── U.S. ───, ───, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam) *rev'g Bryant*, 903 F.2d at 717. The court stated, 'We interpret *Hunter* to hold that the question of whether a reasonable officer could have believed probable cause (or reasonable suspicion) existed to justify a search or an arrest is "an essentially legal question." ' " *Act Up!*, at 873 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

*Act Up!* places the court in the unfamiliar position of making determinations as to the reasonableness of conduct. *See Act Up!*, at 874 ("*Act Up!* also defies our common law tradition, which since time immemorial has considered the reasonableness of human conduct to be a quintessential jury question"). It also leaves the role of the jury in relation to the judge unclear since jurors will be allowed to make findings of fact

■ Because the peculiar benefit of qualified immunity is the freedom from the obligation to stand trial, *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982), the question of whether a reasonable officer could have believed his conduct was proper under established law is a question of law that must be determined by the district court at the earliest possible point in the litigation. *Id.*

### B. State of the Law as to Excessive Force Claims Generally

It was clearly established in 1988 that the use of excessive force against prisoners by prison personnel violated prisoners' Eighth Amendment rights. *See McRorie v. Shimoda,* 795 F.2d 780, 783–84 (9th Cir.1986). It was also clear that prison officials would be liable under section 1983 if their conduct caused the violation. *Id.* (citing *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Prisoners could state a claim against prison personnel under section 1983 "by establishing that prison personnel acted with 'deliberate indifference' in creating the condition that violates the eighth amendment." *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988) (citing *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978) and *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir.1986).

■ The "deliberate indifference" standard requires proving some degree of "individual culpability," but does not require proof of an express intent to punish. *Id.* Since Freitas has set forth specific facts alleging deliberate indifference on the part of Manuma, his claim against Manuma is actionable under section 1983. *See Berg v. Kincheloe,* 794 F.2d 457, 460–61 (9th Cir.1986). *See also Hoptowit v. Ray,* 682 F.2d 1237, 1250 (9th Cir.1982) (prison officials have duty to take reasonable steps to protect inmates from physical abuse).

■ In order to overcome a claim of qualified immunity, however, the plaintiff must show that the right an official is alleged to have violated must be clearly established in a particularized sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 253 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent." *Id.* (citations omitted).

On the basis of this reasoning, defendants contend that they are entitled to qualified immunity, despite the clearly established principle that prison officials may not unnecessarily use force against a prisoner, because the law was unclear in two more particularized senses that arguably affected the defendants' conduct. First, defendants contend that, in 1988, the law was unclear as to whether an isolated and unauthorized attack violated the Eighth Amendment. Second, defendants contend that, at the time of the incident, it was not clearly established that a non-serious injury could form the basis for a section 1983 claim.

### C. State of the Law as to Isolated Attacks by Prison Officials

■ Defendants argue "there is an ongoing and undeniable conflict in the Circuits as to whether an 'isolated and unauthorized' attack, such as that which Freitas alleges here, sets forth an Eighth Amendment violation. R. 21 at 9 (citing *Hudson v. McMillian,* —— U.S. ——, ——, 112 S.Ct. 995, 1001, 117 L.Ed.2d 156 (1992)). In effect, defendants argue that prison guards could have reasonably believed in 1988 that they were entitled to a single attack against an inmate.[4]

with regard to immunity, but not allowed to pass upon their significance. *Id.* at 875–77.

Despite these significant evolutions, the court's inquiry at the summary judgment stage remains essentially unchanged. Though the question of whether an official could reasonably have believed that his actions did not violate clearly settled law is now one for the court to resolve, the underlying conduct is still a factual matter as to which all inferences must be drawn in favor of the party opposing immunity. *Act Up!,* at 873 ("... [T]he determination of what conduct underlies the alleged violation—what the officer and claimant did or failed to do—is a determination of fact"). *See also,* H. Brands, "Qualified Immunity and the Allocation of Decision–Making Functions Between Judge and Jury," 90 Colum.L.Rev. 1045, 1055 (1990).

4. Defendants also argue that the law was unclear in 1988 as to whether a "fair fight"; that is, a

The law does not now, nor has it ever, sanctioned a free bite at the inmate apple for prison officials. There is, to be sure, some conflict among the circuits as to whether the isolated and unauthorized use of force by an official is punishment within the definition of the Eighth Amendment.[5] *Compare Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 ("[A]lthough a spontaneous attack by a guard is 'cruel' and, we hope, 'unusual,' it does not fit any ordinary concept of 'punishment'"); *and George v. Evans,* 633 F.2d 413, 416 (5th Cir.1980) ("[A] single, unauthorized assault by a guard does not constitute cruel and unusual punishment ..."); *with Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985) ("If a guard decided to supplement a prisoner's official punishment by beating him, this would be punishment ..."), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). The thread common to all cases in which the Eighth Amendment has been found to apply "is that 'punishment' has been deliberately administered for a penal or disciplinary purpose, with the apparent authorization of high prison officials charged by the state with responsibility for care, control, and discipline of prisoners." *Johnson v. Glick,* 481 F.2d at 1032.

The Due Process Clause of the Fourteenth Amendment, however, serves as a distinct though overlapping source of substantive protection from state action involving excessive force. *See e.g. Vaughan v. Ricketts,* 859 F.2d 736 (9th Cir.1988) (sustaining separate Eighth and Fourteenth Amendment claims in excessive force complaint). In almost all instances, punishment "inconsistent with contemporary standards of decency" and "repugnant to the conscience of mankind," *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1977), and hence violative of the Eighth Amendment, will also be "conduct that shocks the conscience" or "afford[s] brutality the cloak of law," in viola-

tion of the Fourteenth Amendment. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). But the converse may not be true because not all conduct by prison officials that shocks the conscience is necessarily punishment. Put another way, in the prison context, Eighth Amendment liability is a subset of Fourteenth Amendment liability.

As Judge Friendly noted in *Johnson v. Glick:*

> ... [C]onstitutional protection against police brutality is not limited to conduct violating the specific command of the Eighth Amendment or, as in *Monroe v. Pape,* 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1961) of the Fourth. *Rochin v. California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952), must stand for the proposition that, quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law.

*Johnson,* 481 F.2d at 1032. *See also George v. Evans,* 633 F.2d 413, 416 (5th Cir.1980) ("Whether or not an eighth amendment violation can be established, the use of undue force by a prison guard is actionable as a deprivation of fourteenth amendment due process rights.")

 Defendants argue that this line of reasoning, supporting a subtle distinction between Eighth and Fourteenth Amendment liability, was foreclosed by the Supreme Court in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). In *Whitley,* the Court held that liability under the Eighth and Fourteenth Amendments was coextensive with respect to a prisoner who was shot during an attempt by prison guards to free a colleague who had been taken hostage by an inmate. "... [I]n these circumstances," the Court stated, "the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Pun-

---

personal dispute arising between a guard and an inmate, could serve as the basis of a section 1983 action. *See Defendants' Memorandum In Support of Motion for Summary Judgment* at 11. The court need not address that issue because it is inapposite on the record. Freitas has alleged that Manuma and Stone took him to a secluded area for the purpose of beating him. If true, the

fight was neither fair nor a "personal" dispute between two individuals.

**5.** The Eighth Amendment provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. U.S. Const.Amend. VIII.

ishments Clause." *Id.* at 327, 106 S.Ct. at 1088. *See also Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) ("After conviction, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged and unjustified. Any protection that 'substantive due process' affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment.") (citing *Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088).

From this statement, defendants extrapolate that Eighth and Fourteenth Amendment liability must always be coextensive, or at least that the law was sufficiently unclear on this point at the time of the incident so as to entitle defendants to qualified immunity.

In fact, *Whitley* did nothing to change the well-settled principle that the undue use of force by a prison official is an actionable violation of constitutional law. Aside from the fact that the statement relied upon by defendants limits itself to "these circumstances," *Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088, the statement does no more than state a corollary of the proposition stated *supra* at 1339 that, in the prison context, the scope of the Fourteenth and Eighth Amendments will often be identical.

In some circumstances, however, the scope of the former will exceed the latter. *Whitley* did not present such a circumstance because the complaint there did not turn on the issue of whether the allegedly unconstitutional action was punishment—the factor that most clearly delineates the difference between liability under the Eighth Amendment and liability under the Fourteenth. No argument was raised by the defendants in *Whitley* that their actions were not punishment as contemplated by the Eighth Amendment, nor could such an argument have been successful. In *Whitley,* the shooting that formed the basis of the complaint was precipitated by an agreement among Whitley (a prison guard), the prison superintendent, and the assistant superintendent, that forceful intervention

was necessary to protect the life of the hostage who had been, and the safety of the inmates who were not rioting. Consequently, the allegedly unconstitutional action there was administered with the apparent authorization of a high prison official and hence was 'punishment' within the terms of the Eighth Amendment. *Johnson v. Glick,* 481 F.2d at 1032. Thus, *Whitley* did nothing to disturb the well-established principle that prison officials are liable for the unnecessary and wanton use of force against an inmate, regardless of whether that application of force was an isolated incident.[6]

■ Accordingly, the court turns to the question of whether plaintiff has set forth a valid claim under the Fourteenth Amendment. The standard governing claims of excessive force under this provision is well-established.

In determining whether the constitutional line has been crossed, a court must look to such factors as the need for application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id.* at 1033. *See also Vaughan v. Ricketts,* 859 F.2d at 742; *Meredith v. Arizona,* 523 F.2d 481, 483 (9th Cir.1975). Under the facts alleged by Freitas, a reasonable prison official in 1988 would have known that the beating was not a justifiable application of force. The extent of possible injury was considerable and the insults allegedly directed at Freitas support an inference that the force was maliciously and sadistically applied.

Common sense compels this result as well. The court recognizes that though complicated legal issues are presented here by counsel the level at which qualified immunity is designed to operate is significantly less sophisticated. Since qualified immunity is partially designed to prevent the inhibition of discre-

---

6. If it is indeed the case, as defendants say it must be, that *Whitley* requires Fourteenth and Eighth Amendment liability to be coextensive in all instances, the court finds it more likely that Judge Friendly's definition of "punishment" in

*Johnson v. Glick* was overly narrow than, in light of overwhelming precedent to the contrary, that the entire class of one-time unjustified uses of force by prison officials is not constitutionally actionable.

tionary action by government officials, *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737, prison guards cannot be expected to be experts on the Eighth and Fourteenth Amendments. The court is thus required to ask the question of whether a prison official could have reasonably believed that a use of unjustified force against an inmate was not unconstitutional so long as the incident was an isolated one from the perspective of an ordinary officer employing his common sense understanding of the law. Such an officer could only reasonably answer that question in the negative.

### D. *State of the Law as to the Requirement of a Serious Injury*

■ As a second argument, defendants contend they are entitled to qualified immunity because at the time of the incident it was not clearly established that a non-serious injury could form the basis for a section 1983 action.[7] In support of this assertion of unclarity in the law, defendants rely upon a line of Fifth Circuit cases requiring a showing of serious or severe injury as a prerequisite to section 1983 actions.[8]

There is, unfortunately, little authority on the question of how a court should determine whether a constitutional or statutory right is clearly established. *Gutierrez v. Mun. Ct. of S.E. Judicial District,* 838 F.2d 1031, 1048 (9th Cir.1988); *Capoeman v. Reed,* 754 F.2d 1512, 1514 (9th Cir.1985). *See also Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978) (finding it unnecessary to decide whether "the state of the law is evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court").

Consequently, there is some question as to whether the existence of case law in one circuit running contrary to the established principles of other circuit courts would be sufficient to create an ambiguity in the law upon which an official might reasonably rely

in asserting a claim of qualified immunity. The court need not address that question, however, because, in 1988, there was no ambiguity in the law as to whether a severe injury was required to set forth a claim under the Eighth Amendment, and because the severe injury requirement operated only to exempt *de minimis* applications of force that resulted in significant injuries. It did not extend to conduct likely to cause severe harm that, through good fortune, resulted only in insignificant injuries.

The Fifth Circuit's severe injury requirement evolved from a three-pronged analysis of excessive force claims under the Fourteenth Amendment that considered, among other factors, whether a prisoner alleging use of excessive force had alleged "severe injuries." *Shillingford v. Holmes,* 634 F.2d 263 (1981). *See also Wesson v. Oglesby,* 910 F.2d 278, 283 at n. 4 (5th Cir.1990) (noting that burden under this test was at least as demanding as the explicit significant injury requirement that eventually became the law).

In apparent reliance on the logic of *Shillingford,* the Fifth Circuit upheld the dismissal of several complaints alleging use of excessive force in an arrest for failure to state a claim of constitutional dimensions. *See e.g. Mark v. Caldwell,* 754 F.2d at 1261; *Raley v. Fraser,* 747 F.2d 287.

■ In 1989, the Fifth Circuit made the significant injury explicit in the context of Fourth Amendment claims of excessive force in arrests. *Johnson v. Morel,* 876 F.2d 477, 480. The court stated:

A plaintiff can … prevail on a Constitutional excessive force claim only by proving each of these three elements:

(1) a significant injury, which

(2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was

---

7. Plaintiff has not contested, and the court has accordingly not considered, the defendants' characterization of his injuries as insignificant under Fifth Circuit law.

8. *See* R. 21 at 14. (Citing *King v. Chide,* 974 F.2d 653 (5th Cir.1992); *Wise v. Carlson,* 902 F.2d 417, 417–28 (5th Cir.1990); *Wesson v.*

*Oglesby,* 910 F.2d 278, 283 (5th Cir.1990); *Wisniewski v. Kennard,* 901 F.2d 1276 (5th Cir.1990); *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1185 (5th Cir.1990); *Mouille v. City of Live Oak,* 918 F.2d 548, 554 (5th Cir.1990); *Mark v. Caldwell,* 754 F.2d 1260, 1261 (5th Cir.1985); *Raley v. Fraser,* 747 F.2d 287, 289 (5th Cir.1984)).

(3) objectively unreasonable.

If any one of these elements fails, so too does the plaintiff's claim. We overrule all previous decisions to the contrary.

*Id.* In 1990, the Fifth Circuit extended the significant injury requirement to Eighth Amendment claims of excessive force. *Huguet v. Barnett,* 900 F.2d 838, 841 (5th Cir. 1990). That remained the state of the law in the Fifth Circuit until the Supreme Court's decision in *Hudson v. McMillian,* —— U.S. at ——, 112 S.Ct. at 999. ("The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.").[9]

On December 26, 1988 the state of the law was thus: In all but the Fifth Circuit, the law was clearly established that no allegation of significant injury was required to set forth a valid excessive force claim. *Lester v. City of Chicago,* 830 F.2d 706, 712 (7th Cir.1987) ("If under the totality of circumstances, a police officer unreasonably seizes a person by using excessive force, he has violated that person's Fourth Amendment rights. The objectively unreasonable seizure itself ... crosses the constitutional threshold.") *See also Bilbrey by Bilbrey v. Brown,* 738 F.2d 1462, 1467 (9th Cir.1984).

*Shillingford,* and the cases that followed, offered some basis for a prediction that the Fifth Circuit might adopt an explicit significant injury requirement, a prediction that hindsight would prove to be accurate, but as yet the severity of injury was simply one factor to be considered in determining whether an injury of constitutional dimensions had been alleged. Accordingly, the court concludes that, in 1988, an officer could not reasonably conclude that an infliction of insignificant injury was not actionable under section 1983.

Further analysis of the significant injury requirement supports this conclusion. It would trivialize the significant injury requirement to hold here that the purpose behind the rule was to excuse lucky officers who wantonly apply force that happily does not result in severe injuries. It certainly has never been the law, as the extension of this reasoning would indicate it was, that officers could purposefully beat an inmate up to, but just short of, the nebulous line of significant injury. Nor has it ever been the law that a prison official could pointlessly fire a gun at an inmate and escape liability because the inmate was fortunate enough to duck and evade all but a graze of the bullet.

The point of the significant injury requirement was an attempt, albeit misguided, to offer officers employing force some guidance in conforming their conduct to the law. While officers have never been protected for pointless beatings, they were by this requirement offered some protection for a slap that might unforseeably result in a hemorrhage.

The focus of the significant injury requirement was thus upon the conduct of the officer and not upon the results of his conduct. In *King v. Chide,* the Fifth Circuit formulated this inquiry as follows: "[Could] a reasonably competent officer ... have anticipated that the brief struggle to arrest and handcuff

---

**9.** At oral argument, defendants offered the novel argument that a court opinion reflecting a change in decisional law is sufficient to indicate a prior ambiguity and, hence, can serve as a basis for qualified immunity. Thus, if it were the case, for example, that *Johnson v. Morel* marked a complete reversal of Fifth Circuit law, defendants would argue that it alone would be sufficient to establish a prior ambiguity in the law regarding the requirement of a significant injury regardless of the clarity of prior decisions. Defendants argue that the relevant inquiry is whether an official could make a good faith argument in the reasonableness of his actions and that subsequent decisions are relevant to this determination.

The relevant inquiry in this, as in all instances, is whether a prison official could have reasonably believed in the constitutionality of his actions on the basis of the law at the time of his actions. The occurrence of subsequent evolutionary decisions may correlate closely with instances where a defendant successfully asserts the defense of qualified immunity, since transforming decisions are doubtlessly more likely in areas of the law in which a conflict exists, but the transforming decision itself is not conclusive of any prior ambiguity in the law. Any other rule would, in the case of truly transforming decisions, allow defendants to benefit from retroactive immunity.

In any event, the argument is inapposite on the record before the court. As discussed *infra* at 1342–43, the Fifth Circuit's serious injury requirement has never exempted anything other than *de minimis* uses of force which could not reasonably be expected to cause significant injuries.

 

King would cause the injury King now complains of." *King v. Chide,* 974 F.2d at 658.

Thus, even it were the case that the law was ambiguous in 1988 as to whether an allegation of serious injury was required to set forth a section 1983 claim, qualified immunity would still be improper here because Manuma and Stone could certainly have anticipated that the beating of Freitas might cause the injury of which he now complains.

The court accordingly denies defendants' motion for summary judgment. Under *Act Up!,* however, the court's inquiry with respect to qualified immunity is not as yet concluded. Because a genuine issue of material fact exists as to whether defendants could reasonably have concluded that their actions did not violate clearly established law, determination of the qualified immunity issue must be postponed until the facts are further developed at trial. *Act Up!,* at 873–74. Though the peculiar benefit of qualified immunity—the right not to be forced to stand trial—may be lost to defendants, Manuma and Stone may nonetheless be entitled to qualified immunity if the evidence at trial shows that they could have had a reasonable belief in the constitutionality of their actions.

E. *Defendants' Motion for Stay of Proceedings*

▮ As an alternative to their motion for summary judgment, defendants move for a stay of proceedings pending appeal. Absent a finding by the district court that a defendant's claim of qualified immunity is frivolous or has been waived, the denial of such a motion is an immediately appealable interlocutory order. *Chuman v. Wright,* 960 F.2d 104, 105 (9th Cir.1992); *United States v. Claiborne,* 727 F.2d 842, 850 (9th Cir.1984), *cert. denied* 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984). The taking of such an appeal divests the district court of jurisdiction to proceed with trial.

The court finds that defendants' motion is neither frivolous nor waived. Accordingly, the court grants defendants' motion for stay of proceedings pending interlocutory appeal to the Ninth Circuit.

IV. Conclusion

For the reasons stated above, the court DENIES defendants' motion for summary judgment and GRANTS defendants' motion for stay.

IT IS SO ORDERED.